Roy Alton GREEN, Appellant,

v.

STATE of Alaska, Appellee.

No. 2866.

Supreme Court of Alaska.

May 12, 1978.

Paul L. Davis and Edgar Paul Boyko, Edgar Paul Boyko & Associates, P. C., Anchorage, for appellant.

David Shimek, Asst. Dist. Atty. and Harry L. Davis, Dist. Atty., Fairbanks and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ.

CONNOR, Justice.

Roy Alton Green appeals from a conviction·for careless use of firearms.

Green brought an antique shotgun into the Gold Rush Saloon in Fairbanks on May 14, 1975, apparently to place it in a display of antique guns at the saloon. Green testified that he believed the gun was unloaded, but it was in fact loaded.

While Green was at the Gold Rush Saloon, a friend told him that Chilkoot Charlie's saloon, next door, needed help in fending off members of a motorcycle gang, and Green went to Chilkoot Charlie's, carrying the shotgun. He testified that he kept the gun pointed at the ground, but several other witnesses testified that he pointed it at persons in the bar. Shortly thereafter he was arrested for assault with a dangerous weapon, the gravamen of the offense being that he pointed the gun at a person inside Chilkoot Charlie's.

On May 27, 1975, his preliminary hearing was held in district court in Fairbanks. Because no attorney from the firm retained to represent Green was present, Jonathan H. Link, a Fairbanks attorney, represented Green at the preliminary hearing on ten minutes' notice. Link was not an experienced criminal lawyer. At the completion of the preliminary hearing Green was bound over to the Grand Jury and was subsequently indicted.

At the initial trial date, Janet Martinez, one of the witnesses to the events inside Chilkoot Charlie's, did not appear although she had been subpoenaed. The district attorney's office had been aware that she might not be present. Later they made some efforts to locate her. The tape of her preliminary hearing testimony was played for the jury at the trial.

The court instructed the jurors on careless use of firearms as a lesser included offense within the charge of assault with a dangerous weapon. The jury found Green guilty of the lesser offense. He was sentenced to one year in prison and fined $1,000, the maximum sentence.

Green makes four claims of error:

(1) That he had ineffective assistance of counsel at the preliminary hearing;

(2) That the state failed to use due diligence to locate witness Martinez; therefore, her preliminary hearing testimony should not have been admitted at trial;

(3) That careless use of a firearm is not a lesser offense included within assault with a dangerous weapon;

(4) That the trial court should have held that the offense of careless use of a firearm can only be committed with a loaded and operable firearm.

I

At his preliminary hearing, Green was represented by Jonathan H. Link, an attorney with little experience in criminal law. He was given the case 10 to 15 minutes before the hearing, when Green's retained counsel suddenly found himself unable to appear. He had no opportunity to examine the case file. He testified later that he did not request a continuance of the preliminary hearing because he did not think of it. He thought the hearing might be cancelled by the state.

The circumstances of the preliminary hearing are at issue because the testimony of witness Janet Martinez, given at the preliminary hearing, was played for the jury at trial. Mr. Link admitted that he had no knowledge of Ms. Martinez's background, and knew nothing of the relevance of her testimony except what he had heard at the preliminary hearing from the state's two prior witnesses.

On direct examination, Martinez, the bartender, described the events in Chilkoot Charlie's on the date in question. She positively identified the defendant and very tentatively identified the gun. Mr. Link's cross-examination took about the same amount of time as the direct examination. He explored the possibility that she might not be certain that the events she remembered took place on the day in question, and probed her experience with and ability to identify guns.

These facts were aired at an evidentiary hearing held during the trial, out of the presence of the jury. Mr. Link testified and was examined by counsel for both parties, and the matter was argued to the court. The judge indicated that he had listened to the tape of Mr. Link's cross-examination of witness Martinez at the preliminary hearing. He then applied the "mockery and farce" test of ineffective assistance of counsel, and held that Green had not been the victim of ineffective assistance. Hence he refused to exclude the preliminary hearing testimony of witness Martinez.

It is apparent that the trial court employed the wrong measure of counsel's performance, for in *Risher v. State*, 523 P.2d 421 (Alaska 1974), we abandoned the "mockery and farce" test. In its place we substituted a two-prong test of ineffective assistance: (1) whether counsel's perform-

ance, either generally or in some specific instance fell below what would be expected of a lawyer with ordinary training and skill in the criminal law, and (2) whether this ineffective performance must in some way have contributed to the conviction. Both parties recognize on appeal that Link's performance must be judged by the *Risher* standard.[1]

■ Green stresses that Mr. Link lacked experience in criminal practice, and by his own admission his performance at the preliminary hearing would have been inadequate for a trial. But every lawyer who handles criminal matters has once handled his first criminal matter. Not every lawyer would be guilty of rendering ineffective assistance the first few times he appeared in court. The test is whether his performance was below what would be expected of a lawyer with experience, not whether he in fact had that experience.[2]

■ By hindsight, we know that the cross-examination of Martinez at the preliminary hearing was the only cross-examination she ever was to undergo. At the time of the preliminary hearing, however, nobody knew this—not even those who knew more about this case than Mr. Link. Even the most skilled and prepared attorney would not necessarily be as thorough at the preliminary hearing as he would be at trial. At preliminary hearings, experienced defense attorneys often cross-examine to a limited extent. They may, as Mr. Link did here, merely pin down details of the witness' direct testimony or test the ability of the witness to observe and recall the matters about which the testimony is given. For that matter, experienced attorneys in this position may choose, for tactical rea-

sons, not to cross-examine at all. Given the type of testimony presented by the witness Martinez, we do not know what more could be expected of defense counsel. This is not a situation in which it can be shown that defense counsel, if armed with additional, available information, could have somehow demolished or impaired the direct testimony of the witness. Our conclusion is that the performance of Mr. Link did not fall below that of a lawyer with ordinary skill and training in the criminal law. On this point there was no error.

## II

Green offers a second, entirely separate ground for exclusion of the recorded testimony of Janet Martinez: that the state did not exercise due diligence in seeking her presence at trial.

The confrontation clauses of the state and federal constitutions have been interpreted to permit the prosecution to use prior testimony of witnesses who cannot be located only if the state has exercised due diligence in trying to find them. *Fresneda v. State*, 483 P.2d 1011 (Alaska 1971); *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). This court's first unavailable-witness opinion, *McBride v. State*, 368 P.2d 925, 927 (Alaska 1962), *cert. denied*, 374 U.S. 811, 83 S.Ct. 1702, 10 L.Ed.2d 1035 (1963), held that the question of due diligence was an ordinary question of fact, and that the trial court's decision would be reversed only for manifest abuse of discretion. In *Fresneda v. State, supra*, however, we modified *McBride* in light of *Barber v. Page, supra*, 483 P.2d at 1017. The underlying constitutional basis of the *Barber* case requires that appellate review on this ques-

1. In the reply brief, Green suggests a remand for a new evidentiary hearing before a judge applying the proper test of ineffective assistance. He assumes that the use of the wrong standard is per se reversible error and urges that this court should not itself apply the correct standard to the evidence taken by the trial court. He cites *Steussi v. State*, 512 P.2d 589 (Alaska 1973), in which a case tried under the

M'Naghten insanity standard was remanded after this court adopted the American Law Institute's test as set forth in the Model Penal Code. We do not find the instant case comparable, and the record is adequate for an appellate determination.

2. We note that Mr. Link had four years of experience in civil litigation, and had conducted trials.

tion be less deferential than was stated in the *McBride* case.[3]

When Martinez was served with a subpoena on July 17, 1975, ordering her appearance on the initial trial date of September 8, she told the process server she might be leaving the state before then "under the circumstances." She did not say what the circumstances were. The process server reported this to the district attorney's office. Apparently nothing more was done before September 8.[4]

When Martinez did not appear on September 8, the process server, a judicial services officer of the state troopers, visited her former home and place of employment, and at each place was told that she had moved to California. He found no one who knew her new address. Another officer obtained the same information from a former co-worker of Martinez.

A bench warrant was issued for Martinez's arrest and this information was placed in federal and state criminal information computers. Shortly before the trial date the troopers checked Hayward and San Francisco, California, where she had previously lived. Hayward police reported no record of her, and San Francisco authorities did not respond. The Fairbanks municipal utilities reported that she was not on their customer list. No check was made at the post office for a forwarding address.

After hearing this testimony from three police officers outside the presence of the jury, Judge Blair ruled that the state had made adequate efforts to find Martinez and that the rule of *Fresneda v. State, supra,* was satisfied.

An additional element in the case is that the "circumstances" which led Martinez to decide to leave Alaska may well have been a threat from the defendant that she would be harmed if she testified. She told the grand jury that she had been threatened.

Witness Barnett testified at trial that Green had threatened him. The court considered this possibility as a factor in favor of permitting use of the prior testimony.

Whether the state used "due diligence" can best be ascertained by comparing its efforts with those in previous cases. In *Fresneda v. State, supra,* the following was held insufficient (although harmless error):

"Although the District Attorney's secretary made a few limited efforts to locate Pieren earlier in the month before the trial, no systematic search was begun until about the 22nd of December, 1969, with trial scheduled for the 29th. At that time, the chief of the Juneau police checked police records there and in Anchorage for any trace of Pieren, and found nothing. No subpoena for Pieren was ever issued.

Michael Biggs, court attache, was assigned to look for Pieren on the 27th. After a few hours on the telephone talking to various people, Biggs turned up several persons who said that they believed that Pieren was then in the Army. He made an attempt to verify this through the Adjutant General's office, Department of Military Affairs, but received no answer and apparently did not follow up on his request.

On the date of the trial Mrs. Jones, the prosecutor's secretary, was informed by Major Holmeson of the Army National Guard in Anchorage that Pieren had enlisted on May 16, 1969, and had been sent to Ft. Lewis, Washington, for his eight weeks basic training. Major Holmeson had no knowledge of where he had gone from there, but suggested that he might be in Vietnam. Thus, Pieren's actual physical location was never determined prior to trial. The trial court, apparently assuming that the man was probably in Vietnam, ruled that sufficient diligence

---

**3.** Regarding the rule that constitutional decisions cannot be insulated from appellate review by deeming indispensable subsidiary questions to be questions of fact, *see generally Hicklin v. Orbeck,* 565 P.2d 159 at 163 n. 6 (Alaska 1977), *prob. juris. noted,* 434 U.S. 919, 98 S.Ct. 391,

54 L.Ed.2d 275 (1977), and authorities cited therein.

**4.** The trial was stayed pending this court's decision on a petition for review. Trial eventually commenced January 6, 1976.

had been shown and admitted the former testimony."

483 P.2d at 1016–17.

In *People v. Redston,* 139 Cal.App.2d 485, 293 P.2d 880, 885–86 (1956), which we cited with approval in *Fresneda,* the court held that failure to check the post office and the witness' last known place of employment demonstrated lack of due diligence. Here, the post office was not checked, and the state inquired of the bartender on duty at Chilkoot Charlie's, but never of the owner, manager, or person in charge of the payroll records. *People v. Redd,* 273 Cal.App. 345, 78 Cal.Rptr. 368, 371 (1969), held that failure to check with the last known employer indicated lack of due diligence.

In *Fresneda* we cited *Redston's* definition of due diligence as "a thorough, painstaking and systematic attempt to locate the witnesses." 483 P.2d at 1017. We also held that the state must meet a higher standard when it reports that it cannot find the witness, than when it has found him but in a place beyond the court's jurisdiction. *Id.* Although the police were given indications that Martinez was in California, they never found her, there or anywhere else.[5]

■ In light of *Fresneda* and the authorities there cited we hold that the failure to inquire of the post office and of Martinez's former employer precludes a finding that due diligence was exercised. Although *Fresneda* found that such error could be harmless under certain circumstances, we do not believe that this is such a case. Unlike *Fresneda,* the testimony at issue here was vigorously contradicted. Martinez's testimony goes to the heart of the prosecution's case and, at an evidentiary hearing, the prosecutor characterized it as "absolutely essential." There was other eyewitness testimony, but the prosecutor depicted Martinez "as the only witness whose story is fairly consistent as to what happened." Furthermore, the prosecutor repeatedly referred to the Martinez prelimi-

nary hearing testimony in his closing argument to the jury. The use of the recorded testimony of the witness Martinez was prejudicial error.

### III

Green next asserts that the court erred in giving a jury instruction that careless use of firearms is a lesser offense included within assault with a dangerous weapon.

The state argues that defense counsel agreed to the giving of this instruction and therefore should be precluded by Rule 30(a), Alaska Rules of Criminal Procedure, from objecting to it on appeal. The colloquy on the instruction was as follows:

THE COURT: Number 11 presents the lesser included offense.

MR. BOYKO: I assume that there was presented to the court authority that, as a matter of law, this is a lesser included offense.

(Whispered conversation)

THE COURT: Well, there is authority in agreement that it should be here by both counsel.

MR. BOYKO: Sir?

THE COURT: There was an—there was agreement by both counsel that it should be included.

MR. BOYKO: Well . . .

MR. GULLUFSEN: I cited the court *Burke versus United States* or *United States versus Burke* . . .

MR. BOYKO: All right. I was just . . .

MR. GULLUFSEN: . . . which is the Alaska case . . .

MR. BOYKO: . . . inquiring.

MR. GULLUFSEN: . . . that discusses . . .

MR. BOYKO: If there is authority. I don't think counsel could stipulate to an erroneous instruction, if it were erroneous.

---

**5.** The warrant officer of the state troopers testified over defense objection that he had a caseload of more than 700 warrants and no one to assist him. The defense insists that this is

no excuse. On appeal, the state does not use this fact in an effort to excuse its conduct; it insists that the search made was adequate:

In our opinion, a clear objection was not made, and the objection has been waived. There was, therefore, no error.[6]

### IV

Green's final point on appeal is that the crime of careless use of firearms requires that the gun be loaded and operable when it is pointed at the victim. He asserts that the trial court should have so instructed the jury, and that the prosecutor should not have argued to the jury that there was no such requirement.[7]

The instructions specified that assault with a dangerous weapon required a loaded and operable firearm. Regarding the offense of careless use of firearms, the instructions said nothing one way or the other.

The state urges that this point was not preserved for appeal, because the defendant did not request such an instruction, as Criminal Rule 30(a) requires, and did not object when the prosecutor made his argument. Green concedes that an instruction was not requested, but argues that the trial court should have instructed *sua sponte* because this is an element of the offense, and that the failure to give the instruction constitutes plain error which could be noted for the first time on appeal. We need not rule on whether this question is properly before us. We have reversed the conviction on other grounds. But we will set forth our interpretation of the statute as a guide for retrial.

The parties advance various policy arguments on this issue. Green emphasized that this offense, like assault with a dangerous weapon, was enacted to deal with situations in which bodily harm is likely. He urges that the rule of *Hobbs v. State*, 363 P.2d 357, 358, n. 3 (Alaska 1961), requiring a loaded weapon for assault with a dangerous

weapon, should be extended to this offense. The state points out that "assault with a dangerous weapon" contains the word "dangerous," and that while a firearm is dangerous only when it is loaded and operable, it is a firearm all the time. The state also notes that, "I didn't think it was loaded, I just wanted to scare him," are famous last words, and that there ought to be a criminal penalty for the intentional pointing of any firearm, loaded or unloaded, at a human being.

The careless use statute prohibits several varieties of conduct other than the one at issue here. All the others beside "points or aims a firearm at or toward a person" require explicitly or implicitly that the firearm be discharged and, therefore, that it be loaded and operable. The statute reads in full as follows:

"Sec. 11.15.200. *Careless use of firearms.* (a) A person who intentionally, and without malice, points or aims a firearm at or toward a person, or discharges a firearm so pointed or aimed at a person, or points and discharges a firearm at or toward a person or object without knowing the identity of the object and maims or injures a human being, is guilty of the careless use of firearms, and upon conviction is punishable by a fine of not more than $1,000, or imprisonment for not more than one year, or by both. If an offense specified in this section was committed by a person licensed to hunt and was committed while he was hunting, upon conviction, the court shall, in addition to the penalty imposed in this section, revoke the person's hunting license. A person whose license has been revoked may not purchase another hunting license of any class for a period of not less than one year nor more than 10 years from the date of revocation as determined by the court. If an offense specified in this

---

6. We do not know whether upon retrial an objection will be made to the giving of a lesser included offense instruction. For this reason we have no need to determine whether the giving of such an instruction, over the defendant's objection, would be proper.

7. There was expert testimony that the gun, an antique shotgun, was possibly inoperable. It was in fact loaded, although Green said he did not believe it was. It is an entirely plausible explanation for the verdict that the jurors believed the gun was not operable. If so, then this issue is a crucial one.

section was committed by a person not licensed to hunt and was committed while he was hunting, the court shall, in addition to the penalty imposed in this section, prohibit the person from purchasing any class hunting license for a period of not less than one year nor more than 10 years as determined by the court.

(b) If death ensues from the maiming or injuring, the person discharging the firearm may, in the discretion of the prosecuting officer or grand jury, be charged with the crime of manslaughter.

(c) This section does not apply to a case where firearms are used in self-defense or in the discharge of official duty, or in case of a justifiable homicide."

In our view the statute is broad enough to reach the use of firearms for other than assaultive purposes. Firearms can be instruments of intimidation, even though they are unloaded. The statute was, in our opinion, designed to cover types of conduct which in many instances would not amount to an assault. A loaded and operable firearm is not a necessary element of the offense where what is charged is the pointing or aiming of the firearm at a person. The instruction given in this case was proper.

REVERSED and REMANDED.