Edward Leslie STORES, Appellant,

v.

STATE of Alaska, Appellee.

No. 3595.

Supreme Court of Alaska.

Dec. 19, 1980.

Christine Schleuss, -Asst. Public Defender,
John M. Murtagh, Asst. Public Defender,

and Brian Shortell, Public Defender, Anchorage, for appellant.

John Scukanec, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

CONNOR, Justice.

This appeal requires us to decide whether it was proper to admit into evidence the videotaped deposition of a key prosecution witness who was out of the state at the time of trial.

In March, 1977, Edward Stores was charged with one count of rape.[1] The state's case consisted primarily of the testimony of three witnesses. The prosecutrix, a high school student, testified that the defendant, a stranger, approached her in the school parking lot and asked for a lift to his home because he had been injured in a fight. He claimed that his lip had been split. When they arrived at his residence, she agreed to accompany him inside to explain to his mother the circumstances of his return home in the early afternoon. Stores asked her to wait in the living room, and when he returned he put his arm around her neck and forced her into the back bedroom. He ordered her, at knifepoint, to undress, and then raped her. The act of sexual intercourse was very brief. The two got dressed, left the house together, and she gave the defendant a ride to another location. The defendant asked her for a date but she declined. The victim then returned to school, knocked on a classroom door, and told the teacher she needed to see her friend who was in the class. Since the victim was crying, the teacher excused the friend from class. The victim then related the foregoing story. The friend informed

the victim's mother, who arranged for an immediate gynecological examination for her daughter. The victim's parents also telephoned the police.

This version of events was disputed by another prosecution witness, Mrs. Hughes, the defendant's cousin and legal guardian. Mrs. Hughes testified on direct examination that the defendant informed her that the alleged victim had consented to the sexual act, but that afterwards she became angry with the defendant when he refused her demand for oral sex because of his lip injury. Stores and the young woman argued, and Stores had to force her to leave by brandishing a knife. She threatened that she would "get even with him" for his failure to accommodate her.

On the critical issue of consent, a key prosecution witness was Dr. Sydnam, a family practitioner, whose testimony was presented to the jury on videotape, over the objection of the defense. On the videotape, Dr. Sydnam testified on direct examination that she performed a pelvic examination of the victim shortly after the alleged rape and observed redness and contusion of the vulva, which was tender, and a copious amount of sperm within the vagina, signifying that intercourse had occurred within several hours of the examination. The bruises on the outer walls of the vagina were not, she testified, customarily associated with intercourse between willing partners, but were consistent with forcible intercourse. In addition, she related that the alleged victim "is ordinarily ... very self-assured, calm," but that on the day of this examination, "she was very, very different.... She was not composed and she was not calm, and—and she was visibly upset, and as I described before, crying and—and distraught."

On cross-examination, Dr. Sydnam testified that consensual intercourse could produce the same symptoms "[o]nly if there's

---

1. Former AS 11.15.120 provides:

   "A person who (1) has carnal knowledge of a female person, forcibly and against her will ... is guilty of rape."

The new Criminal Code, effective January 1, 1980, reclassifies rape in AS 11.41.410–.440.

something the matter with the (indiscernible) of the people involved, I think." On re-direct, she repeated that "it's extremely unlikely [that a consenting female could sustain these injuries during intercourse] unless it's extremely prolonged and brutal intercourse, and by extremely prolonged, I mean over a matter of, you know, hours."

The defense rested after the conclusion of the state's case. Stores was convicted by the jury and he was sentenced to seven years' imprisonment.[2]

On appeal, the defendant contends that it was reversible error to admit Dr. Sydnam's videotaped deposition at trial. We must examine this claim of error in the context of the particular factors in this case.

On May 3, 1977, six days before the commencement of trial, the state informed the court that Dr. Sydnam, its key witness, would be out of the state and unavailable to testify at the trial. The prosecutor moved for an order to take her deposition. He gave the following grounds as "good cause" for ordering the deposition:

"I have reviewed the police report in connection with Dr. Sydnam's examination of the alleged victim, ... and feel that her testimony would be *highly corroborative of the victim's complaint.* Dr. Sydnam basically would testify that the victim did sustain some injury to the vaginal area of her body...

The State feels that Dr. Sydnam's testimony would be *absolutely necessary to corroborate the victim's statement that she was forcibly raped, and to counter the anticipated defense of consent.*" (emphasis added).

Since it was evident to the defendant that the purpose of the deposition was to preserve Dr. Sydnam's testimony, he objected, not to the taking of the deposition, but to its anticipated use at trial, as a violation of the defendant's right of confrontation and Alaska Rule of Criminal Procedure 15. The defense suggestion of a continuance

was opposed by the state and denied by the court. The court granted the state's motion and on May 5, 1977, Dr. Sydnam's deposition was recorded on videotape.

Defendant and his counsel were present. In response to preliminary questioning by the prosecutor, the witness testified that she had long-standing vacation plans to spend in excess of two weeks in Hawaii, that she would leave the state of Alaska "next Tuesday evening or Wednesday morning," that she had made arrangements to share a condominium with three other persons, who, if she cancelled her trip, would be financially obligated to pay her pro-rata share of the rental fee. The witness was asked and she answered:

"Q. Okay. All right. Assuming that you were to be subpoenaed to remain here in Anchorage say, next Tuesday or next Wednesday, I take it that you would abide by that subpoena and remain here and frustrate your plans, is that correct?

A. I suppose so."

At trial, the defendant renewed his objections to the use of the videotape. The objections were overruled and the tape was played for the jury.[3]

On appeal, the defendant maintains that the admission of the pre-trial deposition under these circumstances violated both his confrontation rights guaranteed by the sixth amendment and Alaska Rule of Criminal Procedure 15. The state, on the other hand, argues that since the witness was not present at the trial and "presumably" beyond the jurisdiction of the court, it was proper to admit her pre-recorded testimony as substantive evidence. The state also maintains that the defendant's cross-examination of the witness at the time of the deposition satisfies his sixth amendment rights.

We note that the United States Supreme Court has never expressly authorized the

---

2. Former AS 11.15.130(c) authorized a sentence of one to twenty years upon conviction for forcible rape of an unrelated female over the age of 16 by a person over the age of 19.

3. The videotape was played on a 21-inch television screen, in black and white, with a synchronized audio portion played on a tape recorder. Testimony was given from the witness stand.

use of an absent witness' deposition in lieu of viva voce testimony in a criminal trial, although it has allowed the use, in narrow circumstances, of testimony from a prior trial, e. g., *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); or testimony from a preliminary hearing, e. g., *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). From the very first, the Court has recognized that

> "[t]he primary object of the [Confrontation Clause] . . . was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look upon him, and judge by his demeanor on the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Mattox*, 156 U.S. at 242–43, 15 S.Ct. at 339, 39 L.Ed. at 411. While a definitive history of the sixth amendment remains to be written,[4] we adopt the observation of Justice Harlan that "[f]rom the scant information available it may tentatively be concluded that the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers and absentee witnesses." *California v. Green*, 399 U.S. 149, 179, 90 S.Ct. 1930, 1946, 26 L.Ed.2d 489, 509 (1970) (Harlan, J., concurring).[5]

We think that one of the purposes which the Confrontation Clause serves is to relieve prosecutors of the temptation to use pre-recorded testimony instead of live witnesses.[6]

---

**4.** It has been suggested that the reason for adoption of the Confrontation Clause as a bulwark against the use of letters and other second-hand accounts by the prosecution when the actual accusing witnesses were in fact available was the practice at common law whereby "the proof was usually given by reading depositions, letters and the like; and this occasioned frequent demands by the prisoner to have his accusers, i. e., the witnesses against him, brought before him face to face." 1 J. Stephen, A History of the Criminal Law of England 326 (1883). *See* Baker, *Right to Confrontation, the Hearsay Rules and Due Process—a Proposal for Determining When Hearsay May Be Used in Criminal Trials*, 6 Conn.L. Rev. 529, 532 n.16 (1974); Graham, *The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One*, 8 Crim.L. Bull. 99, 130 (1972); Graham, *The Right of Confrontation and Rules of Evidence: Sir Walter Raleigh Rides Again*, 9 Alaska L.J. 3 (Jan. 1971); Graham, *The Right of Confrontation and Rules of Evidence: The Return of the Portuguese Gentleman*, 9 Alaska L.J. 3 (May 1971).

**5.** History supports this interpretation. *See State v. McO'Blenis*, 24 Mo. 402, 421 (1857) (Ryland, J.) ("There are many things, aside from the literal import of the words uttered by the witness while testifying, on which the value of his evidence depends. These it is impossible to transfer to paper. Taken in the aggregate, they constitute a vast moral power in eliciting the truth, all of which is lost when the examination is had out of court and the mere words of the witnesses are reproduced in the form of deposition."). See Lord Strafford's plea in his November, 1680, impeachment: "I beg your lordships that he [the witness Dugdale] may look me in the face, and give his evidence, as the law is. . . . I desire the letter of the law, which says, my accuser shall come face to face." 7 Howell's State Trials 1293, 1341 (Cobbett's ed. 1810). See also the trial of Sir Walter Raleigh for treason in 1603, where the following repartee took place between the accused and the court after the Crown introduced the statement of Lord Cobham, Raleigh's principal accuser, who was absent from the trial:

> "The proof of the Common Law is by witness and jury; let Cobham be here, let him speak it. Call my accuser before my face, and I have done."

Raleigh's demand for confrontation was answered by Justice Warburton:

> "I marvel, Sir Walter, that you being of such experience and wit should stand on this point; for so many horse-stealers may escape, if they may not be condemned without witnesses."

2 Howell's State Trials 15–16, 18 (1816).

**6.** One commentator has expressed concern that liberal use of hearsay "may induce prosecutorial negligence in securing witnesses. . . . Such practices undermine any system of criminal justice that presumes innocence and insists that the process of rebutting the presumption be absolutely above reproach." Note, *Confrontation and the Hearsay Rule*, 75 Yale L.J. 1434, 1438–39 (1966).

Thus, we are in agreement with Professor Westen's conclusion that

> "the confrontation clause is not merely a constitutional rule governing the attendance of witnesses; it also embodies constitutional controls on the manner by which the state presents its case against the accused.
>
> This broader notion of confrontation not only is consistent with the Court's language, but serves an important procedural purpose. It requires the state, wherever possible, to present its evidence against the accused in what is traditionally considered the most reliable form, that of direct testimony in open court." (footnote omitted).

Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases*, 91 Harv.L.Rev. 567, 578 (1978).[7]

■ There are, however, certain instances where the interests embodied in the Confrontation Clause give way to a competing interest, namely, the state's "strong interest in effective law enforcement . . . ." *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, 607 (1980). Thus, under the federal standard, out-of-court statements may be used at trial if a two-tier test is met. First, the Confrontation Clause requires a showing that the declarant is unavailable. Second, the statements are admissible only if they bear adequate "indicia of reliability." *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608. Often, where the evidence falls within an established hearsay exception, reliability can be inferred. *Id.* In other cases, the evidence must be excluded, "absent a showing of particular guarantees of trustworthiness." *Id.*

We need not reach, however, the constitutional issue presented, since Alaska Rule of Criminal Procedure 15 serves a purpose similar to that of the Confrontation Clause with regard to the use of depositions in criminal cases. Each conditions the use of such out-of-court testimony upon an initial showing of unavailability. The rule permits the deposition of a prospective witness to be taken for discovery purposes upon order of the court for good cause shown.[8] But the use at trial of a deposition is conditioned upon either the stipulation of the parties, or the unavailability of the witness.[9] Under Criminal Rule 15(e) a witness is unavailable when he is:

> "(1) Exempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of his statement; or
>
> (2) Persistent in refusing to testify despite an order of the judge to do so; or
>
> (3) Unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

7. In his article, Professor Westen proposes the following rule to limit the state's discretion in presenting evidence against the accused:

> "Before it may use a witness' out-of-court statements against the accused at trial, the state has an obligation to make a 'good faith effort' to produce the witness in person and, having produced the witness, to try to elicit his evidence in the form of direct testimony under oath and in the presence of the jury." 91 Harv.L.Rev. at 579.

8. Criminal Rule 15(a) provides in pertinent part:

> "*When Taken.* Upon order of the court for good cause shown, the testimony of a prospective witness may be taken by either party for discovery upon notice and after the deposing party has disclosed all statements, exhibits, and witness lists required by Rule 16."

This differs from the analogous Federal Rule of Criminal Procedure 15 which authorizes the use of depositions not for discovery purposes, but only to preserve evidence, *U. S. v. Steffes*, 35 F.R.D. 24 (D.Mont.1964), and from Alaska Rule of Civil Procedure 27(a) which permits the taking of depositions for the purpose of perpetuating testimony. The defendant has not raised the use of the deposition to preserve evidence as a ground of appeal.

9. Criminal Rule 15(d). This rule also permits the use of a deposition at trial for impeachment purposes. *Compare* Alaska Rule of Civil Procedure 32(a)(3) authorizing use at trial of a deposition for "exceptional circumstances [which] make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used. . . ."

(4) Absent from the hearing and beyond the jurisdiction of the court to compel appearance and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance." [10]

■ The question is thus narrowed to an inquiry of unavailability, that is, whether the state, the proponent of the witness in this case, "exercised reasonable diligence but [was] unable to procure [her] attendance" at *trial*.[11] Alaska R.Crim.P. 15(e)(4).

In *Fresneda v. State*, 483 P.2d 1011 (Alaska 1971), we addressed ourselves to the standard of "due diligence" which must be exercised by the proponent of a witness' statement to secure the presence of a witness at trial before it seeks to introduce former testimony of that witness. In *Fresneda*, one of the state's witnesses who testified at the first trial [12] was absent at the retrial. The state made no sincere effort to locate this witness until seven days prior to the retrial when a check of police records in Juneau and Anchorage, where the witness was believed to reside, revealed no trace of him.

Two days prior to trial, the court attache was assigned to the search. His inquiries disclosed the possibility that the witness had enlisted in the Army, but he did not follow up on his request for verification of this fact. On the day of trial, the prosecutor's secretary learned that the witness had in fact enlisted in the Army approximately seven months earlier, and had been sent to Fort Lewis, Washington, for eight weeks of basic training. Her source of information, a major in the Army National Guard, had no actual knowledge of the witness' location, but suggested that he might be in Vietnam. The trial court apparently assumed that the witness was in fact in Vietnam and admitted the former testimony.

■ We held this ruling to be error on the part of the trial court, *id.* at 1018; [13] we found that the prosecution's efforts to locate the witness [14] did not measure up to the standards of due diligence recently announced by the United States Supreme Court in *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).[15] We now

---

**10.** It is significant to note that the 1975 Committee Notes to the Federal Rule of Criminal Procedure 15, from which the Alaska Rule is derived, specifically state: "The committee does not want to encourage the use of depositions at trial, especially in view of the importance of having live testimony from the witness on the witness stand." 8 Moore's Federal Practice ¶ 15.01[3], at 15–10 (Rev. ed. 1978).

**11.** We think it is clear that the witness was not beyond the jurisdiction of the court to compel appearance.

For witnesses not in prison, the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings provides a means by which prosecuting authorities from one state can obtain an order from a court in the state where the witness is found, directing the witness to appear in court in the first state to testify. The state seeking his appearance must pay the witness a specified sum as a travel allowance and compensation for his time. AS 12.50.010–.080.

**12.** We reversed the first conviction in *Fresneda v. State*, 458 P.2d 134 (Alaska 1969).

**13.** *Fresneda* modified our holding in *McBride v. State*, 368 P.2d 925, 927 (Alaska 1962) that "[t]he question of diligence or lack of it on the part of the state in attempting to find the

witness is in the first instance a question of fact for the trial judge to decide, and we shall reverse his decision only if there has been a clear abuse of discretion."

**14.** We noted that

"United States Army Reg. 27–45 provides a method for obtaining the return of Army personnel to testify in civil and criminal cases." 483 P.2d at 1018 n.26.

**15.** *Barber* reversed an Oklahoma conviction which rested in part on the state's use at trial of a transcript of the preliminary hearing testimony of a witness who at the time of trial was incarcerated in a federal prison in Texas. The state made no attempt to subpoena the witness, claiming instead that use of the former testimony was proper where a witness was unavailable to testify merely because he was outside the jurisdiction, if the defendant had been afforded his right of cross-examination at the time the testimony was given. (The Court assumed the defendant waived his right to cross-examine at the preliminary hearing. 390 U.S. at 722, 88 S.Ct. at 1320, 20 L.Ed.2d at 259). The United States Supreme Court found this contention to be constitutionally untenable:

"We start with the fact that the State made absolutely no effort to obtain the presence of Woods at trial other than to ascertain that he

reiterate our position that the showing required under Criminal Rule 15(e) to establish unavailability parallels the showing required under federal constitutional law.

■ In light of the constitutional basis of the decision in *Roberts* and *Barber,* the determination of whether the witness was unavailable must be made independently by the reviewing court. *Green v. State,* 579 P.2d 14, 16–17 (Alaska 1978). In *Green,* a witness subpoenaed by the district attorney failed to appear at trial. Even though the district attorney had advance knowledge that the witness might not show up at trial,[16] he took no action to secure her presence until the initial trial date.[17] A bench warrant was issued and state troopers, who had learned of the witness' move to California, checked with authorities in two cities

there. They never located the witness, and the trial court admitted into evidence her preliminary hearing testimony. We reversed on the ground that the trial court had erroneously concluded that the state's efforts to locate the missing witness were adequate. We concluded that the state's failure to check with the witness' last known employer or the post office for a forwarding address demonstrated lack of due diligence,[18] which precluded the use at trial of the witness' preliminary hearing testimony.

■ The requirement of good-faith, diligent efforts to secure the presence of the witness before preliminary hearing testimony may be introduced against an accused in a criminal trial applies with equal force to

was in a federal prison outside Oklahoma. It must be acknowledged that various courts and commentators have heretofore assumed that the mere absence of a witness from the jurisdiction was sufficient ground for dispensing with confrontation on the theory that 'it is impossible to compel his attendance, because the process of the trial Court is of no force without the jurisdiction, and the party desiring his testimony is therefore helpless.' 5 Wigmore, Evidence § 1404 (3d ed. 1940).

Whatever may have been the accuracy of that theory at one time, it is clear that at the present time increased cooperation between the States themselves and between the States and the Federal Government has largely deprived it of any continuing validity in the criminal law....

In this case the state authorities made no effort to avail themselves of either of the above alternative means of seeking to secure Woods' presence at petitioner's trial.... In short, a witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. The State made no such effort here, and, so far as this record reveals, the sole reason why Woods was not present to testify in person was because the State did not attempt to seek his presence. The right of confrontation may not be dispensed with so lightly." (footnotes omitted).

390 U.S. at 723–24, 88 S.Ct. at 1321, 20 L.Ed.2d at 259–60.

Subsequently, in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court allowed the use of a preliminary hearing

transcript in a criminal trial. Unlike the facts of *Barber,* in *Roberts* the state made a sufficient good-faith effort to locate the witness so as to enable the court to reasonably conclude she was unavailable. In *Roberts,* five separate subpoenas for the witness were issued for four different trial dates; each was served at the home of the witness' parents, her last known address. The state contacted the parents four months before trial in an effort to locate the witness. Her parents did not know her whereabouts, nor did they know how to locate her. *Id.* at 75, 100 S.Ct. at 2543, 65 L.Ed.2d at 613. In fact, no one in the witness' family had been able to locate the witness in over a year. *Id.* at 75, 100 S.Ct. at 2544, 65 L.Ed.2d at 614.

16. The witness had informed the process server that she might be leaving the state and he in turn conveyed this information to the district attorney. 579 P.2d at 17.

17. The trial was stayed for four months pending decision on a petition for review. 579 P.2d at 17 n.4.

18. In *Fresneda,* 483 P.2d 1017, we relied upon the following language, which we cited with approval in *Green,* 579 P.2d at 18:

"The word 'diligence' connotes persevering application, untiring efforts in good earnest. There must be evidence of a substantial character to support the conclusion of due diligence. [What is required is] a thorough, painstaking and systematic attempt to locate the witnesses."

Quoting *People v. Redston,* 139 Cal.App.2d 485, 293 P.2d 880, 886 (1956).

the use of a deposition taken prior to trial.[19] As we said in *Fresneda*,

> "While we recognize that there is a difference between testimony elicited at preliminary hearings and testimony introduced at trial in terms of completeness and depth of cross-examination, we find that this difference should not be the basis for the requirement of a different standard of due diligence in each case."

483 P.2d at 1017 n.25.

■ Applying the standards of due diligence developed in *Fresneda* and *Green* to the instant case, we find that the state failed to make any effort to secure the presence of Dr. Sydnam at trial even though it had advance knowledge not only of her plans to depart, but also of her willingness to appear at trial if subpoenaed. The sole purpose of taking the deposition was to create former testimony to be used in lieu of live testimony. We will not sanction such an evasion of the constitutionally based preference for live testimony in open court which is embodied in Criminal Rule 15. The conduct of the state in failing to subpoena the witness precludes a finding that due diligence was exercised.[20] The deposition was inadmissible under Criminal Rule 15.

The state asks us to relax the specific requirements of Criminal Rule 15(e), and the preference for in personam testimony embodied in former Criminal Rule 26,[21] in accordance with the provision of Criminal Rule 53[22] "to facilitate business and ad-

---

**19.** There is, however, a distinction between former trial testimony and a deposition taken prior to trial:

> "First, at the time a deposition of a prosecution witness is taken the defense may not be prepared adequately to cross-examine, while prior trial testimony is used only at a time when the defendant is presumably ready for trial. The second difference is that the testimony of a witness at a prior trial has been subjected at least once to the crucible of in-court scrutiny by judge and jury. This is, perhaps, another way of saying that testimony in the solemn, impressive atmosphere of a ... courtroom, before the eyes of a keen judge and an observant jury, may be given with a little more care, deliberation and accuracy on the part of the witness than it might be given [otherwise]." (footnotes omitted).

*United States v. Singleton*, 460 F.2d 1148, 1155 (2d Cir. 1972) (Oakes, J., dissenting), *cert. denied*, 410 U.S. 984, 93 S.Ct. 1506, 36 L.Ed.2d 180 (1973).

**20.** We reject the state's claim in this case that its failure to subpoena the witness was "reasonable." First, as we said in *Fresneda*, "we find it inappropriate to encourage any but the best efforts to [secure the presence of] witnesses in view of the qualitative differences between live and recorded testimony." 483 P.2d at 1018 n.24. Second, the case upon which the state relies, *State v. Reid*, 559 P.2d 136 (Ariz. 1976), is distinguishable on the facts.

In that case, prior to Reid's trial for murder, armed robbery, burglary and theft of a motor vehicle, the prosecution moved for an order to videotape the testimony of the coroner's pathologist who planned to be out of the country for extended travel during the dates set for trial. The motion was granted and the videotaped deposition was used at trial. The Arizona Supreme Court upheld the use of the deposition in lieu of viva voce evidence because the deposition was "used for a purely foundational matter."

> "Although Dr. Hirsch did testify concerning the angle of the bullets, leading to the inference that the victim was shot in the back, his testimony herein was concerned primarily with the cause and time of death which testimony was not seriously questioned but which was a necessary foundation to the establishment of the crime."

*Id.* at 148.

The Arizona court took pains to note that a different result might be warranted if the testimony sought to be had by deposition were "crucial." *Id.* at 149. Dr. Sydnam's testimony goes far beyond merely foundational matters.

Nor does *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) compel a different result. Unlike the facts in *Roberts*, here, Dr. Sydnam's whereabouts were fully known. The only "unavailability," if any, was temporary. The state had the ability to compel her attendance, but chose not to exercise that power. Such conduct hardly constitutes due diligence.

**21.** At the time of trial Criminal Rule 26(a) provided, in pertinent part:

> "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by statute or by these rules."

Criminal Rule 26 was rescinded effective August 1, 1979 by Supreme Court Order 369.

**22.** Criminal Rule 53 states:

> "*Relaxation of Rules.* These rules are designed to facilitate business and advance justice. They may be relaxed or dispensed with by the court in any case where it shall be

vance justice." Since the application of the rule came before the trial court, it would have been up to the trial judge to relax the rules. In this instance, however, if the trial court had indicated that the rules were being relaxed, we would have to find such ruling to be an abuse of discretion.

While relaxation of the rules is not tantamount to rewriting a rule, even if we felt free to rewrite Criminal Rule 15,[23] we would refuse to do so in this case. First, the defendant is entitled to the benefit of the procedural rights which this court has conferred upon him. Second, trial by deposition under these circumstances would not advance justice.[24] We are sympathetic to the inconveniences which may attend adherence to the rules, but we are also mindful that "the giving of testimony and the attendance upon court . . . are public duties which every person within the jurisdiction of the government is bound to perform upon being properly summoned. . . . The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public." *Blair v. United States*, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979, 982–83 (1919). If fear for the safety of one's self and family is not a valid excuse for failure to appear in court to testify, *Piemonte v. United States*, 367 U.S. 556, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961),

then disruption of vacation plans is surely insufficient.

■ The erroneous admission of the videotaped deposition must compel reversal unless harmless. Although evidentiary error may be harmless in some circumstances, *Fresneda v. State*, 483 P.2d 1011, 1018 (Alaska 1971), it is not so here. Reversal based upon non-constitutional, evidentiary error revolves around "what the error might have meant to the jury." *Love v. State*, 457 P.2d 622, 630 (Alaska 1969). Under the *Love* test, we must examine the error to determine whether the jury was substantially influenced or swayed in its verdict by the introduction of the evidence in the context of the entire trial record. If improperly admitted evidence is merely cumulative, and the state's case is otherwise very strong, the error may be deemed harmless, even if of constitutional dimension, *e. g.*, *Burford v. State*, 515 P.2d 382, 384 (Alaska 1973); but where the disputed evidence "appreciably affect[s] the jury's verdict," the error requires reversal. *Stevens v. State*, 582 P.2d 621, 626 (Alaska 1978).

■ Significant differences exist between testimony by videotape and testimony face-to-face with the jury. Videotape may affect the jurors' impressions of the witness' demeanor and credibility.[25] Such

---

manifest to the court that a strict adherence to them will work injustice."

**23.** We have declined to rewrite the Rules of Criminal Procedure from the bench, noting that expansion of the rules is appropriately accomplished by amendment upon recommendation of the Rules Committee, the bench and the bar. *Buchanan v. State*, 561 P.2d 1197, 1209 (Alaska 1977).

**24.** Indeed, it may subvert justice, as is suggested in Note, *The Criminal Videotape Trial: Serious Constitutional Questions*, 55 Or.L.Rev. 567, 570–72 (1976). Both the Ninth and Second Circuit Courts of Appeals have held that videotaped pre-trial depositions of witnesses may be used in lieu of personal appearance before the jury where the defendant was present with counsel and given an opportunity to cross-examine and the prosecution has made a "good faith" effort to produce the witness at trial. *United States v. King*, 552 F.2d 833 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646,

52 L.Ed.2d 357 (1977) (videotaped depositions of two unindicted co-conspirators unavailable to testify because they were incarcerated in Japan were admissible); *United States v. Singleton*, 460 F.2d 1148 (2d Cir. 1972), *cert. denied*, 410 U.S. 984, 93 S.Ct. 1506, 36 L.Ed.2d 180 (1973) (videotaped deposition of critically ill prosecution witness admissible). However, the Eighth Circuit has expressed some doubt on the constitutionality of use of a videotaped deposition at a criminal trial. *United States v. Benefield*, 593 F.2d 815, 821 (8th Cir. 1970).

**25.** As one commentator has pointed out, there is a potential for distortion of a juror's perception of a witness whose testimony is presented by videotape.

"Some courts and legal commentators have assumed that evidence recorded on videotape can simply be transported from courtroom to television monitor with little or no effect upon it. In reality, however, the camera unintentionally becomes the juror's

considerations are of particular importance when the demeanor and credibility of the witness are crucial to the state's case. We cannot agree with the dissent that this "is not a case involving the testimony of a crucial eyewitness, when it might be important at trial to test the witness's powers of observation, memory, or possible bias." To the contrary, Dr. Sydnam was a crucial eyewitness to the aftermath of the alleged rape, who testified not only to the physical condition of the victim, but also to her distraught emotional state. The doctor's testimony that injuries to the victim's vaginal areas were inconsistent with willing intercourse, but consistent with forcible rape, was the most compelling evidence offered by the state on the issue of consent. In addition, as the victim's family doctor, there was a possible basis for bias. Thus, there were many aspects of Dr. Sydnam's testimony as to which her "powers of observation, memory, or possible bias" were very much at issue here. Given her testimony, we conclude the jury was substantially influenced in its verdict by the introduction of the videotaped deposition.

Moreover, there is a further distinction between trial testimony and videotaped testimony taken prior to trial which may have significance here. With videotape, the witness cannot be cross-examined in the context of other evidence and testimony which has been presented at trial. Store's counsel may have taken a different approach to the cross-examination of Dr. Sydnam had her testimony been taken as part of the prosecution's entire case. If the doctor had been available at trial, the defense would have had the opportunity to explore any discrepancies between the testimony of various witnesses and to recall the doctor to clarify any medical questions that might have arisen during the course of the trial.

The use of videotape, in the trial process is relatively new. Its real impact remains undetermined. This is not to say that a videotaped deposition should never be used at trial; in fact, it may provide the most reliable and accurate means of preserving testimony when the witness is truly unavailable for trial. It is quite a different matter, however, to conclude that the erroneous admission of a videotaped deposition of a crucial witness, who was available to testify at trial, had no effect on the outcome of the trial.

We have not hesitated to reverse where an error flows from prosecutorial violation of the Rules of Criminal Procedure. *Stevens v. State*, 582 P.2d 621 (Alaska 1978). In view of the requirements of *Love* and the concomitant substantial effect that the deposition must have had on the jury's verdict, reversal is required.

We find the other contentions advanced by the defendant on appeal to be without merit.

REVERSED.

BOOCHEVER and BURKE, JJ., not participating.

MATTHEWS, Justice, dissenting.

I disagree with the majority's opinion that the admission of Dr. Sydnam's videotaped deposition was not harmless error beyond a reasonable doubt.

The question is not simply whether the state might have obtained a conviction without Dr. Sydnam's testimony. It appears plain that had the state or the trial

---

eyes, necessarily selecting and commenting upon what is seen. . . .

Evidence distortion is most serious when videotaping a witness because the picture conveyed may influence a juror's feelings about guilt or believability. . . . Variations in lens or angle, may result in failure to convey subtle nuances, including changes in witness demeanor such as a nervous twitch or paling and blushing in response to an important question, all of which are potentially important to jury decision making. Whether testimony is taped in black and white or in more expensive color may also be of critical importance.

Furthermore, the camera itself is selective of what it relates to the viewer. Transmission of valuable first impressions may be impossible, and off-camera evidence is necessarily excluded while the focus is on another part of the body or another witness." (footnote omitted).

Note, *supra* note 24, at 574–76.

judge insisted, Dr. Sydnam would have appeared in court. It is also abundantly clear that had Dr. Sydnam testified in court her testimony would have been admissible. Therefore, the critical question is whether there was a significant difference between the testimony as it was actually presented to the jury on the videotape and as it might have been presented had Dr. Sydnam appeared in person at Stores' trial.

The videotaped testimony was prepared within less than a week of trial. It was clear to the defendant and his lawyer that the purpose of the taping session was to preserve the doctor's testimony for use at trial. Thus, this is not a case where the defendant's lawyer did not have adequate time to prepare, or where the issue to be proved or the quantum of proof needed was different from that at trial. Such might be the case if testimony from a preliminary examination or a deposition believed to be for discovery purposes were used.[1]

The defendant had the assistance of the same lawyer at both the taping session and at trial. A trial judge was present and ruled on objections raised by both parties. Defendant's lawyer freely cross-examined the witness.

A videotape records the demeanor of a witness with even more faithfulness than a sound recording. With regard to the latter, we said in *McBride v. State*, 368 P.2d 925, 928–29 (Alaska 1962) (footnotes omitted),

cert. denied, 374 U.S. 811, 83 S.Ct. 1702, 10 L.Ed.2d 1035 (1963):

The entire direct and cross-examination were played back through a high fidelity loudspeaker mounted on the courtroom wall. The jury was able to hear the inflections of voice which are so often important. They were able to note the readiness and promptness of the witness's answers or the reverse; the distinctness of what he related or lack of it; the directness or evasiveness of his answers; the frankness or equivocation; the responsiveness or reluctance to answer questions; the silences; the explanations; the contradictions; and the apparent intelligence or lack of it. These are vital elements touching upon the witness's veracity which are available in this jurisdiction to be noted and weighed by a jury even when the witness is not present in person. To a large extent, then, demeanor evidence is available for a subsequent jury; it is no longer wholly "elusive and incommunicable" as in the case of manual reporting of former testimony.

Finally, Dr. Sydnam testified as an expert witness concerning the results of her medical examination of the victim. This was not a case involving the testimony of a crucial eyewitness to the events of the crime, where it might be important at trial to test the witness's powers of observation, memory, or possible bias.[2]

---

1. "A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial." *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1323, 20 L.Ed.2d 255, 260 (1968).

2. In *State v. Reid*, 559 P.2d 136, 149 (Ariz. 1976), *cert. denied*, 431 U.S. 921, 97 S.Ct. 2191, 53 L.Ed.2d 234 (1977), the Arizona Supreme Court allowed the testimony of a coroner to be videotaped prior to trial. The court noted:

We find no error in allowing Dr. Hirsch to testify by videotape under the appropriate safeguards contained herein. In deciding as we do, we wish to emphasize that our decision might be different were he an eyewitness to the events of the crime. Such a crucial witness should not be lightly excused from attendance at the trial itself. When

considering when to allow a witness to testify by videotape in a criminal trial, the trial court must balance the right of the defendant to the right of confrontation and the need of the trier of fact to the additional benefit of having a particular witness testify in person at the trial with the extent of the need for the witness to be away at the time of trial. The treatment by the courts of witnesses has not always resulted in willing and cooperative testimony once witnesses have been compelled to attend court. Because of his professional speciality, Dr. Hirsch, a pathologist, might not be able to go on a vacation without disrupting or postponing trial dates. The right of the defendant to confront the witness against him can also accommodate the convenience of the witness without doing an injustice.

There is no reason to doubt the truth or accuracy of Dr. Sydnam's testimony, nor does the defendant suggest her testimony was in any way unreliable. The defendant has not suggested that some profitable line of cross-examination was left unexplored. Under the circumstances, admitting the videotape was harmless error. Accordingly I would affirm the conviction.

