**UNITED STATES of America**

v.

**Santos CHARLES, Jr., Steven McAninch.**

**Cr. No. C–82–148.**

United States District Court,
S.D. Texas,
Corpus Christi Division.

Feb. 14, 1983.

Tony Guajardo, Asst. U.S. Atty., Houston, Tex., Howard L. Feinstein, U.S. Dept. of Justice, Crim. Section, Civil Rights Div., Washington, D.C., for plaintiff.

Phil Westergren, Corpus Christi, Tex., for Santos Charles, Jr.

Gustavo Acevedo, Asst. Public Defender, Laredo, Tex., George McCall Secrest, Jr., Asst. Federal Public Defender, Houston, Tex., for Steven McAninch.

## ORDER GRANTING DEFENDANTS' MOTION TO SUPPRESS HYPNOTICALLY–ENHANCED TESTIMONY

HEAD, District Judge.

Santos Charles, Jr., and Steven McAninch, who together as city policemen in Alice, Texas, are accused of violating the civil rights of their prisoner Juan Alonzo by beating him, have filed a motion to suppress the hypnotically-enhanced testimony of Trinidad Jasso, Jr. An evidentiary hearing was conducted by the Court on January 20, 1983.

On January 12, 1981, Jasso was serving as a deputy jailer at the Jim Wells County Jail in Alice, Texas. Believing that he witnessed events pertinent to the prosecution of the Defendants, the authorities interrogated Jasso on at least three occasions and in response to each of those interrogations, Jasso executed a written statement concerning the events he observed in the early morning hours on January 12, 1981. The first statement,[1] dated January 14, 1981, makes no mention of or reference to any beating administered by the Defendants to the deceased Juan Alonzo. The second statement,[2] dated February 26, 1981, denies knowledge of any beating of Alonzo. The third statement,[3] dated February 27, 1981, states that Jasso did witness one of the

1. "On 1–12–81 at approximately 2:50 AM dupety [sic] jailer Trinidad Jasso Jr. while working at the co [sic] jail, subject Juan Alonzo was brought in to the county jail by the Alice Police Department for a [sic] unknown charge or charges. At this time subject (Alonzo) was taken to the booking room. Later the subject (Alonzo) was brought in to where the telephone is at this time I (Jasso) asked subject (Alonzo) if he would like to make a phone call Mr. Alonzo answer [sic] NO. I (Jasso) then placed subject (Alonzo) in the drunk tank Deputy Javier Martinez from Brooks Co. Sheriff Dept. was here with me (Jasso) at the time that subject (Juan Alonzo) was placed in the drunk tank the subject (Alonzo) was charge [sic] with drunk in public & disorderly conduct and discharging a fire arm in the city."

2. "... A short while later city officers Santos Charles, Lee Pena and other city officers brought Mr. Juan Alonzo to the County Jail. I do not recall who the other city officers were. Officers Pena and Charles were holding Mr. Alonzo, one on each arm. They went directly to the booking room when they brought Mr. Alonzo in. *I never saw Mr. Alonzo being mistreated at this point.* I do not recall how long they had Mr. Alonzo in the booking room before he was brought into the jail itself. *I also do not recall anything unusual or any loud noises coming from the booking room while they had Mr. Alonzo there.* The next time I saw Mr. Alonzo was when Officer Charles and another city officer brought Mr. Alonzo to the booking desk. I do not recall who the other officer was. Mr. Alonzo at this time leaned against the west wall of the receiving area. Mr. Alonzo at that time was holding a pair of boots in one hand and what appeared to be a jacket in the other. I at that point, did not notice any physical injuries to Mr. Alonzo's person. I did observe that Mr. Alonzo was

intoxicated. It is department policy that all in-coming prisoners be observed for any physical injuries before they are incarcerated [sic]. It is standing orders from the Sheriff that no prisoner be booked or incarcarated [sic] if he is injured." (Emphasis added.)

3. "A short while later city officers Santos Charles, Lee Pena and Steve McAnich [sic] brought Mr. Juan Alonzo to the County Jail. I at this time, I was standing by the door and saw officer Charles push Mr. Alonzo to the floor. *While Mr. Alonzo was on the floor I saw officer Charles walk up to him and kick him hard on the left side of the stomach.* When officer Charles did this, I heard him tell Mr. Alonzo, 'Levonta te culedo, Bastardo.' After that all the officers went in the room and closed the door so I would not see what they were going to do. The officers that went in the booking room were Pena, Charles and McAnich [sic]. I then closed the jail door and told deputy Xavier Martinez to come to the door so he could hear what type of guys were back there. When I said these guys I meant the city officers. *While we were at the door, we could hear the chairs being pushed around and the officers yelling at Mr. Alonzo using profane language in spanish [sic]. I could also hear someone moaning several times, like as if they were being hit in the stomach.* After this we went back to the booking desk to finish booking deputy Martinez's prisoners because he had to get back to Brooks County. While we were doing this, an other city officer by the last name of Martinez knocked on the back door and told me that he had an other prisoner. I then told this officer that he would have to wait because I had other prisoners ahead of his. After this, officer Charles knocked on the door and asked me for a property bag. I then went

officers kick Alonzo and heard sounds of a fight in the room at the jail where the Defendants were holding Alonzo. This third statement was produced and the events disclosed and allegedly recalled because Jasso's memory was enhanced during an hypnotic session that occurred on February 27, 1981. The Defendants challenge this testimony that Jasso will give at trial against them on the grounds that the testimony is tainted by improper procedures used before and during the hypnotic session and on the denial of the right of confrontation.

The circumstances leading to the hypnotic session are hereafter described. Believing from another witness that Jasso in fact "must have seen" the Defendants beat Alonzo, the District Attorney and Luis R. Salinas, his investigator, interrogated Jasso for the third time on February 27, 1981. After Jasso again denied seeing the Defendants abuse the deceased, Salinas, who himself is now deceased, suggested that he hypnotize Jasso to enhance his memory. Salinas had received his training in hypnosis from a one-week course sponsored by the Texas Department of Public Safety in Austin, Texas. To the District Attorney's knowledge, Salinas had hypnotized only three people, Jasso being the only one for a criminal case. Jasso agreed to the session which occurred in the office of the District Attorney immediately following the interrogation. During the hypnotic session, Jasso stated under hypnosis that he saw Santos Charles kick the deceased in the stomach and that he heard moans and noises of a scuffle from the adjoining room where the Defendants were holding the deceased. This is the tainted testimony sought to be suppressed by the Defendants.

Jasso testified at the hearing before the Court. He stated that he now remembers seeing the events he recalled for the first time under hypnosis. Jasso's testimony was confusing and difficult to follow. Time orientation was not clear. Without regard to which attorney examined him, Jasso tended to agree with that attorney. Jasso complained that he was suffering presently from the ill effects of the hypnotic session.

To inform the Court on the nature of hypnosis, its potential uses and limitations, the Defendants called Dr. Jack Tracktir, a psychologist specializing in hypno-therapy. Tracktir described himself as an international authority on hypnosis, as a member of various professional societies and academies, as a practitioner for thirty years, and as a teacher at the Baylor College of Medicine. The Court does not doubt that he is qualified as an expert in forensic hypnosis. The Government did not challenge his expertise nor present an expert to rebut Tracktir's testimony.

Tracktir testified hypnosis is a state of heightened suggestibility during which a person will accept and follow suggestions uncritically. For this reason, hypnosis should be conducted by a completely neutral person to prevent any form of suggestion. According to Tracktir, testimony can be influenced not only by leading questions during the hypnotic session but also by interrogations occurring before the session, especially if conducted by the hypnotist. Under hypnosis, the subject has an inclination to accept the suggestions made by the interrogator. While the skill of placing someone under hypnosis can be learned in

---

back to my desk and got a property bag and went to the booking room and gave it to officer Charles. While I was in the booking room, I observed Mr. Alonzo sitting in a chair with his hands behind his back as if he were handcuffed. I then walked back out and back into the jail. As I walked out I saw one of them close the door behind me. I then went back in the jail and let deputy Martinez out the front door. After this, officers Charles and McAnich [sic] brought Mr. Alonzo in the jail receiving area to be booked. Mr. Alonzo at this time leaned against the west wall of the receiving area. Mr. Alonzo at this time was holding a pair of boots in one hand and what appeared to be a jacket in the other. I at that point, did not notice any physical injuries to Mr. Alonzo's person. The only thing I noticed was that Mr. Alonzo appeared to be very tired. I also observed that Mr. Alonzo was somewhat intoxicated. It is department policy that all in coming prisoners be observed for any physical injuries before they are incarcerated [sic]. It is standing orders from the Sheriff that no prisoner be booked or incarcerated [sic] if he is injuried [sic]...." (Emphasis added).

one day, Tracktir testified that the proper use of hypnosis to interrogate and enhance memory cannot be learned in one week, but is a procedure that must be learned over time.

In the doctor's expert opinion, which the Court accepts, Jasso was not properly hypnotized and the entire session had the substantial likelihood of altering Jasso's recollection of the facts to suit Salinas. Tracktir substantiates his opinion by:

(i) Jasso's testimony reflecting time disorientation and suggestibility;

(ii) The leading and suggestive nature of the questions asked during the interrogation;

(iii) The repeated changes in the tenses of the verbs in the questions—i.e., from past to present and back again;

(iv) The lack of a neutral interrogator and locale of interrogation; and

(v) The timing of the hypnotic session in immediately following a preceding interrogation by the hypnotist.

The Fifth Circuit has not had occasion to address the issue of admissibility of hypnotically-enhanced testimony, nor have the courts of the State of Texas. The Ninth Circuit has held that hypnotically-enhanced testimony is admissible in a criminal case. *See United States v. Awkard,* 597 F.2d 667 (9th Cir.1979), *cert. den.,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *United States v. Adams,* 581 F.2d 193 (9th Cir. 1978), *cert. den.,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *United States v. Narciso,* 446 F.Supp. 252 (E.D.Mich.1977). The Defendants refer the Court to numerous state court cases in which hypnotically-enhanced testimony has been held inadmissible. *See Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (Pa.Sup.1981); *State Ex Rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (Ariz.Sup.1982); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (N.J.Sup.1981); *State v. Mack,* 292 N.W.2d 764 (Minn.Sup.1980); *People v. Shirley,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (Cal.Sup.1982); *People v. Gonzales,* 108 Mich.App. 145, 310 N.W.2d 306 (Mich.App.

1981); *State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (Neb.Sup.1981).

While the Ninth Circuit has recognized the admissibility of hypnotically-enhanced testimony and leaves the matter in the lap of the jury, the Ninth Circuit does recognize that hypnotically-enhanced testimony carries a dangerous potential for abuse. *United States v. Adams,* 581 F.2d 193 (9th Cir. 1978), *cert. den.,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). Some minimum standards are set forth in a footnote in *Adams.* This Court does not believe that the footnote contained in the *Adams* opinion by the Ninth Circuit to be exhaustive. In this case, the potential for abuse feared by the Court in *Adams* is pervasive, as reflected by Dr. Tracktir's testimony. The hypnotist was untrained and conducted an unprofessional session. Salinas is no longer available for display to the jury so that the Defendants may demonstrate his lack of abilities and neutrality in the suggestive process of hypnotically-refreshed testimony. The hypnotic session was followed abruptly on the heels of a third police interrogation. The Court has reviewed the transcript of the hypnotic session and followed the testimony of Dr. Tracktir and concurs that many of the critical questions were leading and suggestive. The confused testimony of the witness is consistent with the confusion Tracktir suggests would be caused by an unprofessionally conducted hypnotic session.

This Court does not doubt that hypnotically-refreshed testimony can play an acceptable role in evidence in criminal cases under appropriate circumstances. Considering all of the circumstances of this case, set forth above, the Court concludes that while Jasso's evidence is relevant, its probative value is substantially outweighed by the danger of unfair prejudice to the Defendants and should therefore be excluded. Rule 403, Federal Rules of Evidence.

The Court additionally finds that the Defendants' constitutional rights will be substantially prejudiced if they are denied an opportunity to examine Salinas. In this case, Salinas' competence and the suggestive nature of the procedures he employed

**698**

are significant keys to the testimony of Jasso. Salinas's unavailability for examination prevents the Defendants from testing the accuracy of the testimony which will be solicited through Jasso and deny Defendants, under the circumstances limited to this case, their Sixth Amendment rights to confront a witness against them. U.S.C.A. Const. Amend. 6. The concern of the Sixth Amendment is to guarantee that the jury has an adequate opportunity to assess the credibility of witnesses. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Salinas's role in Jasso's testimony is so significant that his absence would defeat the purposes of the above cited authorities.

Therefore, Defendants' motions to suppress hypnotically-enhanced testimony are granted.