Joseph CONTRERAS and Ricky Glen Grumbles, Petitioners,

v.

STATE of Alaska, Respondent.

No. S–230.

Supreme Court of Alaska.

April 18, 1986.

Rehearing Denied May 21, 1986.

Susan Orlansky, Asst. Public Defender, Dana Fabe, Public Defender, Anchorage, for petitioner Contreras.

Donald W. McClintock, Baily & Mason, Anchorage, for petitioner Grumbles.

David Mannheimer, Asst. Atty. Gen., Office of Special Prosecution and Appeals, Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for respondent.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

When a witness is hypnotized by the police in an effort to identify a suspect, is the witness' subsequent testimony at trial, as to facts and recollections adduced during hypnosis, admissible evidence? The court of appeals held that hypnosis did not render a witness incompetent to testify as to matters adduced during hypnosis, and that hypnotically generated statements or recollections could be admissible in evidence. *State v. Contreras*, 674 P.2d 792 (Alaska App.1983). The issue is now before us on petition for hearing, filed pursu-

ant to Alaska R.App.P. 302(a). We reverse[1] and adopt a rule that permits a witness who has been previously hypnotized to testify only to facts which he related prior to hypnosis.

## BACKGROUND

Joseph Contreras was indicted on charges of kidnapping, assault in the third degree, and three counts of sexual assault in the first degree.[2] The complaining witness was S.J., one of Contreras' alleged victims. Prior to Contreras' arrest, S.J. was hypnotized by Investigator Parmeter, an Anchorage police officer trained in hypnosis, in an effort to identify a suspect. S.J. later identified Contreras as her assailant and the perpetrator of the crimes charged in the indictment.

Prior to trial Contreras filed a motion for protective order to exclude all testimony by S.J. on the grounds that her memory was tainted by the hypnotic session and that Contreras' Sixth Amendment right of confrontation would be violated if she were permitted to testify. The superior court conducted a lengthy evidentiary hearing, taking testimony from three experts on hypnosis.[3] Superior Court Judge Douglas J. Serdahely granted Contreras' motion in part, concluding that S.J.'s testimony "pertaining to the subject matter considered during [the] hypnotic session" was to be excluded; the rest would be admitted. This ruling barred the introduction of S.J.'s identification of Contreras at trial.

Judge Serdahely ruled that the test for the admissibility of new scientific evidence developed in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923) was applicable and that hypnosis did not meet the test's requirements. He further held that Contreras' right to confront and cross-examine S.J. would be impaired if she testified about subjects covered during hypnosis since the court accepted the testimony of those experts who stated that hypnosis adds to a witness' confidence in her recall and alters her demeanor.

Judge Serdahely also rejected the approach that hypnotically adduced testimony may be admitted if certain safeguards are met, since he concluded that there was a lack of agreement in the relevant scientific community as to what safeguards are adequate.[4] The State petitioned the court of appeals for review.

Ricky Glen Grumbles was indicted on charges of burglary in the first degree, attempted murder in the first degree and theft in the second degree. Grumbles' alleged victim was Mary Hall, who was shot after she discovered an intruder burglarizing her apartment. Like S.J., Hall was hypnotized by Investigator Parmeter in an effort to identify her assailant. She later identified Grumbles.

In the superior court, Grumbles moved to suppress Hall's testimony. He, too, argued that the victim's identification was irrevo-

1. The only issue that we address is the one described above. The other issues raised by petitioners were correctly decided by the court of appeals and require no further comment.

2. Petitioners' indictments are described in greater detail in the opinion of the court of appeals. *State v. Contreras*, 674 P.2d at 794-95.

3. Dr. Martin Reiser, who testified for the prosecution, is a psychologist who has worked with the Los Angeles police department for over a decade, using hypnosis in criminal investigation. Dr. Reiser conducts training seminars for police officers around the country in the use of hypnosis as an investigative tool.

Dr. Bernard Diamond, who testified for the defense, is a clinical psychiatrist with extensive experience in the therapeutic and forensic use of hypnosis. For a time he worked as an expert

witness for criminal defendants, examining them under hypnosis to try to reconstruct their mental state at the time of the offense, an approach he has since abandoned.

Dr. Donald Rossi, who testified in rebuttal for the prosecution, is currently employed as the director of the behavioral science section of the Michigan state police. Dr. Rossi is trained in both clinical hypnosis and investigative hypnosis. He has also worked as an investigative hypnotist, although his present duties with the Michigan state police do not include training police officers to conduct hypnosis or hypnotizing witnesses himself.

4. Judge Serdahely additionally voiced concern about the expense to the parties and the waste of judicial resources that would result from litigating the reliability of hypnosis if all safeguards were not maintained.

cably tainted by the hypnotic session. Judge Seaborn J. Buckalew, after reviewing a transcript of the expert testimony in Contreras' case, denied Grumbles' motion to suppress. He ruled that "any influence the hypnotic session might have had on Hall's identification was a matter affecting her credibility to be determined by the jury and not a matter of competency to be determined by the court." *State v. Contreras*, 674 P.2d at 794–95. Grumbles petitioned the court of appeals for review.

The court of appeals consolidated these petitions and granted both, stating:

> Given the difference of opinion between the trial courts in these two cases, the importance of the issue, and the substantial difference of opinion reflected in decided case law throughout the United States, we have granted the petitions for review to resolve the issue prior to completion of the trials in question.

*Id.* at 795 (citation omitted).

The court of appeals reversed the superior court in *Contreras*, holding that hypnotically adduced testimony is admissible. The court affirmed the superior court's ruling in *Grumbles*.

DISCUSSION

I. *The Hypnotic Process.*

There is no generally accepted definition of what is hypnosis,[5] although "there is considerable consensus at the descriptive level." [6] There are two major camps into which hypnosis theorists divide themselves. The viewpoint of the first group, represented at Contreras' evidentiary hearing by Dr. Diamond, expert witness for the defense, is that hypnosis is a distinctive altered mental state or "trance" in which a person tends to respond to suggestions in an uncritical fashion. The other camp, represented by Drs. Rossi and Reiser, the state's expert witnesses in *Contreras*, denies the existence of a special trance state and explains hypnotic behavior as simply a function of the subject's rapport with the hypnotist, as well as his set of attitudes, reservations and expectations regarding hypnosis.

On the basis of a variety of empirical and theoretical works cited by petitioners we think it is apparent that suggestibility poses a fundamental problem with admitting hypnotically induced statements or recollections.[7] As Judge Wachtler writing for the Court of Appeals of New York observed in *People v. Hughes*, 59 N.Y.2d 523, 466 N.Y. S.2d 255, 260, 453 N.E.2d 484, 489 (N.Y. 1983):

> In fact suggestion is the method or mechanism used to induce the hypnotic state. Of course the power of suggestion does not affect all people to the same extent and, indeed, has little or no effect on some. It is recognized, however, that the hypnotic subject will be affected to some degree in three primary respects. (footnotes omitted)

According to the Court of Appeals of New York the three areas affected were as follows: first, that a person who has been hypnotized becomes increasingly susceptible to suggestions consciously or unconsciously advanced by the hypnotist or others present during the session; second,

---

5. *State v. Contreras*, 674 P.2d at 802 (there is a "great deal of controversy as to precisely what hypnotism is."); Orne, *On the Simulating Subject as a Quasi-Control Group in Hypnosis Research, What Why and How*, in Hypnosis: Developments in Research and New Perspectives, 519, 520–21 (E. Fromm, R.E. Shor, eds., 2d ed.1979) ("there is no generally accepted definition of hypnosis.").

6. Orne, *supra* note 6, at 520–21.

7. Council on Mental Health, *Medical Use of Hypnosis*, 168 J. A.M.A. 186, 187 (1958), reprinted in Mickenberg, *Mesmerizing Justice: The Use of*

*Hypnotically—Induced Testimony in Criminal Trials*, 34 Syracuse L.Rev. 927, 932, n. 30 (1983); Bowers & Bowers, *Hypnosis and Creativity: A Theoretical and Empirical Reapproachment*, in Hypnosis: Developments in Research and New Perspectives, 351 (E. Fromm, R.E. Shor, eds., 2d ed.1979); E. Hilgard and E. Loftus, *Effective Interrogation of the Eyewitness*, 27 Int'l J. of Clin. & Exp. Hyp. 342, 353 (1979); Putnam, *Hypnosis and Distortions in Eyewitness Memory*, 27 Int'l J. of Clin. & Exp. Hyp. 437 (1979).

The state also acknowledges that one of the characteristics of hypnosis is heightened suggestibility.

that the subject himself may confabulate;[8] and third, that the subject will experience an increased confidence in his subsequent recollection of the incident in question.[9]

In addition to proof demonstrating the hypnotized subject's increased susceptibility to suggestion, Contreras adduced substantial evidence showing confabulation and enhanced certainty on the part of hypnotized subjects. In regard to confabulation Contreras contended that early "age regression" studies, in which adults "recalled" events from early childhood, were not verified at the time and were later shown to be products of confabulation.[10] Contreras also noted that when asked, hypnotized subjects are able to describe in detail the year 2000—an indication of the ease with which fantasy is induced.[11] In Orne's view, confabulation results from a decrease in critical judgment in hypnotized subjects. If the appropriate suggestions are made during hypnosis, the subject, who is less tolerant of memory gaps in the hypnotized state simply mixes confabulated detail with actual memory in order to structure a whole and internally consistent memory. The confabulated and actual memories then become indistinguishable.[12] Sloane's study also reported that hypnotized subjects were more confident of their recollections.[13]

Given these three detrimental aspects of hypnosis, the record in these cases, and the

8. Confabulation is a process "whereby a person who is under substantial pressure to remember a perception, such as details of the appearance of an assailant, but in fact had no perception to remember, is encouraged to unconsciously manufacture those details from her other experiences or her imagination." *State v. Contreras*, 674 P.2d at 792.

9. *People v. Hughes*, 466 N.Y.S.2d at 259, 453 N.E.2d at 489. *See also, State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177, 181 (1984) where the court stated in part:

Although scientists do not understand the exact nature of hypnosis, they do recognize that it is a trance-like state induced by the hypnotist. Beyond this superficial explanation, the following characteristics have been observed:
1. *Subsidence of the planning function.* The hypnotized subject loses initiative and lacks the desire to make and carry out plans of his own. . . .
2. *Redistribution of attention.* . . . [U]nder hypnosis selective attention and selective inattention go beyond the usual range. . . .
3. *Availability of visual memories from the past, and heightened ability for fantasy-production.* . . . The memories are not all veridical, and the hypnotist can in fact suggest the reality of memories for events that did not happen.
4. *Reduction in reality testing and a tolerance for persistent reality distortion.* . . . Reality distortions of all kinds, including acceptance of falsified memories . . . and all manner of other unrealistic distortions can be accepted without criticism within the hypnotic state.
5. *Increased suggestibility.* The suggestibility theory of hypnosis is so widely accepted that hypnosis and suggestibility come to be equated by some writers on hypnosis.
6. *Role behavior.* The suggestions that a subject in hypnosis will accept are not limited to specific acts or perceptions; he will, indeed, adopt a suggested role and carry on complex activities corresponding to that role.
7. *Amnesia for what transpired within the hypnotic state.* . . . [Amnesia] is not an essential aspect of hypnosis. . . . Yet it is a very common phenomenon, and it can be furthered through suggestion.
E. Hilgard, The Experience of Hypnosis 6–10 (1968), . . . . These characteristics demonstrate the need for extreme caution in using hypnotically refreshed testimony in a judicial proceeding.

10. Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int'l J. Clin. & Exp. Hyp. 312 (1979); Foenander & Burrows, *Phenomena of Hypnosis: 1. Age Regression*, in Handbook of Hypnosis and Psychosomatic Medicine, 67, 891 (G. Burrows, L. Dennerstein, eds. 1980).

11. Orne, *supra* note 11, at 322–23.

12. *Id.* at 319–20.

13. Sloane, *A Comparison of Hypnosis vs. Waking State and Visual Versus Non-Visual Recall Instructions for Witness/Victim Memory Retrieval in Actual Major Crimes*, 102–103 (1981) (University Microfilms International). Orne points out that even if hypnosis did not produce greater confidence in its subjects, to the extent that hypnosis produces an increased amount of detail (some accurate, perhaps, some confabulated) in the witness' recall, the witness is likely to become more credible to jurors, simply because his accounting is more detailed. Orne, Soskis & Dinges *Hypnotically-Induced Testimony and the Criminal Justice System*, 40–41. *See also, People v. Shirley*, 181 Cal.Rptr. at 255, 641 P.2d at 787; *People v. Hughes*, 466 N.Y.S.2d at 264, 453 N.E.2d at 494.

relevant case law and literature, we are in full agreement with the observations of the Supreme Court of North Carolina in *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984). There Justice Exum writing for the court stated:

The possibility that a person's testimony might be the result of suggestion from another person presents a firm indictment of the reliability of such testimony. The potential for suggestion is exacerbated by the fact that the hypnotic process is directed by a particular individual and the attention of the subject is wholly focused upon that person. Furthermore, suggestions can be entirely unintended and even unperceived by the hypnotist as well as the subject. Likewise, the subject experiences an overwhelming desire to please the hypnotist and, hence, becomes even more susceptible to suggestion. The subject may unwittingly produce responses which he perceives to be expected. Since a subject under hypnosis undergoes an impaired critical judgment, he may give undue credence to vague and fragmentary memories upon which he would not have relied outside the hypnotic state. A combination of a susceptibility to suggestion and a compelling desire to please the hypnotist causes the subject to experience an unwillingness to admit that he cannot recall certain events. Thus he becomes susceptible to creating the event.

If we accept as true the notions of suggestibility and a tendency to confabulate, the dangers surrounding hypnotically refreshed testimony become even more pronounced when we realize that it is virtually impossible for the subject or even the trained, professional hypnotist to distinguish between true memory and pseudo memory.... Both the subject and the hypnotist would tend to accept the accuracy of the post-hypnotic recall. Certainly if neither the subject nor the hypnotist can distinguish between the true memory and confabulation, a lay observer, be it judge or juror, could hardly make the distinction. Absent objective, independent means to verify this recall, its accuracy must remain both unknown and unknowable.

In addition to resulting in this inability to distinguish between actual and created memory, the process of hypnosis tends to enhance the subject's confidence in his memory, whether genuine or invented.... After a subject experiences what he believes to be a recall of events under hypnosis, he may develop an unshakable subjective conviction and confidence in his refreshed recollection. One court noted that this problem

is enhanced by two techniques commonly used by lay hypnotists: Before being hypnotized the subject is told (or believes) that hypnosis will help him to 'remember very clearly everything that happened' in the prior event, and/or during the trance he is given the suggestion that after he awakes he will 'be able to remember' that event equally clearly and comprehensively. ... This difficulty is enhanced after the subject leaves the hypnotic session because he "remembers the content of his new 'memory' but forgets its source, *i.e.*, forgets that he acquired it during the hypnotic session...." ...

In short, hypnosis not only irrevocably masks whether a subject's recall induced by it is true, it also creates a barrier to the ascertainment of its truthfulness through cross-examination—that method normally relied on in the courtroom to test the truthfulness of testimony. *Id.* 319 S.E.2d at 181–82. (citations omitted)

## II. INADMISSIBILITY OF HYPNOTICALLY REFRESHED TESTIMONY.

We conclude that hypnosis renders a witness' subsequent testimony inadmissible for several reasons.[14]

---

14. The following state courts have held that hypnotically adduced testimony is inadmissible. *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981), *modified State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982); *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (1982), *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114; *Commonwealth*

## A. *The Frye Test.*

In *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), the court held that the testimony of an expert concerning the results of polygraph testing of a witness must be excluded. The court ruled that since the polygraph had not yet received general scientific acceptance, testimony about it could not be admitted. The *Frye* court commented:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

293 F. at 1014.

The state argues that the *Frye* test is only applicable to expert testimony regarding the reliability of information obtained through a scientific technique and is not meant to apply to the testimony of a previously hypnotized witness. In our view, the state's reading of *Frye* is unduly narrow. The principles and policies supporting the *Frye* test apply equally to hypnotically adduced lay testimony. Further, *Frye* is applicable because lay testimony that is dependent upon hypnosis cannot be logically dissociated from the underlying scientific technique.

This court adopted the *Frye* test in *Pulakis v. State*, 476 P.2d 474, 478 (Alaska 1970), holding that polygraph evidence may not be admitted because the reliability of the method had not yet been established generally in the scientific community. *See also Troyer v. State*, 614 P.2d 313, 319 n. 12 (Alaska 1980). Most courts considering the question of whether hypnotically adduced testimony is admissible have applied the *Frye* test or a similar "general acceptance" standard.[15] A few courts have held that *Frye* does not apply to the testimony of previously hypnotized witnesses.[16]

v. *Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1980); *People v. Gonzales*, 415 Mich. 615, 329 N.W.2d 743 (1982), *modified on other grounds*, 336 N.W.2d 751 (Mich.1983); *State v. Mack*, 292 N.W.2d 764 (Minn.1980); *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648 (1981); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981); *State v. Martin*, 101 Wash.2d 713, 684 P.2d 651 (1984); *People v. Quintanar*, 659 P.2d 710 (Colo.App.1982); *Collins v. State*, 52 Md. App. 186, 447 A.2d 1272 (1982); *People v. Hughes*, 88 A.D.2d 17, 452 N.Y.S.2d 929 (1982) *aff'd*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983); *Robison v. State*, 677 P.2d 1080 (Okla.Crim.App.), *cert. denied*, —— U.S. ——, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). See Note, *The Admissibility of Hypnotically Refreshed Testimony*, 20 Wake Forest L.Rev. 223 (1984).

**15.** *See State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266, 1282–85 (1982); *People v. Shirley*, 181 Cal.Rptr. at 262–265, 641 P.2d at 794–96; *People v. Quintanar*, 659 P.2d at 711–12; *Peterson v. State*, 448 N.E.2d 673, 676–77 (Ind. 1983); *State v. Collins*, 296 Md. 670, 464 A.2d 1028, 1033–34 (1983); *Commonwealth v. Kater*, 447 N.E.2d at 1195–96; *People v. Gonzales*, 329 N.W.2d at 745–46; *State v. Mack*, 292 N.W.2d at 767–69; *State v. Little*, 34 Cr.L. 2337 (Mo.App., Jan. 3, 1984); *State v. Palmer*, 313 N.W.2d at 654–55; *State v. Hurd*, 86 N.J: 525, 432 A.2d 86,

91 (1981); *People v. Hughes*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 259–66, 453 N.E.2d 484, 489–95 (1983); *Robison v. State*, 677 P.2d at 1085; *Commonwealth v. Nazarovitch*, 436 A.2d at 172–73.

Nearly every court that has considered the contention that *Frye* does not apply to hypnosis has rejected it. *People v. Shirley*, 181 Cal.Rptr. at 263, 641 P.2d at 795 (*Frye* test applies to evidence "based upon" or "developed by" new scientific techniques); *Polk v. State*, 48 Md.App. 382, 427 A.2d 1041, 1048 (1981) ("The induced recall of the witness is dependant upon, and cannot be disassociated from, the underlying scientific method"); *People v. Gonzales*, 329 N.W.2d at 746; *State v. Mack*, 292 N.W.2d at 768 (although hypnotically adduced recall not strictly analogous to mechanical testing, *Frye* equally applicable); *State v. Hurd*, 432 A.2d at 91; *Commonwealth v. Nazarovitch*, 436 A.2d at 172 ("[A]ny means by which evidence is scientifically adduced must satisfy the standard established in *Frye*.").

**16.** *United States v. Valdez*, 722 F.2d 1196, 1200–01 (5th Cir.1984); *State v. Seager*, 341 N.W.2d 420, 429 (Iowa 1983); *State v. Brown*, 337 N.W.2d 138, 149 (N.D.1983); *State v. Armstrong*, 110 Wis.2d 555, 329 N.W.2d 386, 393 *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983); *Brown v. State*, 426 So.2d 76, 86–90 (Fla.App.1983).

There are four reasons why the *Frye* "general acceptance" standard is appropriate when reviewing the admission of new types of scientific evidence: 1) the standard is judicially manageable; 2) the standard saves judicial time and resources; 3) the standard assures that juries will not be misled by unproven, unsound "scientific" procedures, thus safeguarding the court's truth-finding role; and 4) the standard assures fairness and uniformity of decision-making.

The *Frye* standard is essentially a "prejudice-versus-probative value test," similar to Evidence Rule 403. Since there is a significant danger of prejudice from admitting evidence which appears scientific and is especially likely to be accepted and believed, and which has no probative value if it is unreliable, such evidence should be excluded. Application of the *Frye* test permits the court, rather than the jury, to make a threshold reliability determination.

The state argues that if *Frye* were applied to ordinary eyewitness testimony, it too would fail, since there is a considerable body of scientific literature indicating that eyewitnesses are subject to the same dangers of memory distortion under traditional interviewing techniques as they are under hypnosis.[17] Attempting to sidestep the *Frye* test by comparing hypnosis to other memory refreshing interrogation devices rather than to scientific techniques for developing new evidence, as some courts have done,[18] is misguided. The analogy is inappropriate because hypnosis potentially alters both the subject's memory and demeanor, while conventional memory refreshing devices do not.[19] That traditional forms of evidence might have problems qualifying under *Frye* should not prevent *Frye's* application to new forms of evidence that are indisputably problematic, such as hypnosis.

If hypnotically adduced testimony were to be admitted, the jury would have to decide the question of the credibility of the witness. However, this determination would be predicated upon the jury's understanding of the scientific underpinnings of the methods by which the testimony was developed. The way a jury would evaluate such testimony is closely analogous to the way it would evaluate evidence developed from polygraph testing.

There is little question that hypnosis fails to qualify under *Frye*. Applying *Frye* is a two-step process: first, the relevant scientific community must be defined, and second, the testimony and publications of the relevant experts in the field must be evaluated to determine if there is general consensus that hypnotically adduced testimony is reliable.

We define the relevant scientific community as the academic, scientific, and medical or health-care professions which have studied and/or utilized hypnosis for clinical, therapeutic, research and investigative applications. It does not include those whose involvement with hypnosis is strictly limited to that of practitioner, technician or "operator"—for example, Officer Parmeter. We exclude technicians from the group because *Frye* requires scientific, not merely technical, judgments to be made.

We note that in determining whether there exists consensus within the relevant scientific community that hypnosis is reliable, it is not this court's duty to decide which side of the debate is correct, but rather to determine if there is sufficient

---

**17.** See Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?* 38 Ohio St.L.J. 567, 587–88 (1977).

**18.** See *Chapman v. State,* 638 P.2d 1280, 1282 (Wyo.1982); *People v. Smrekar,* 68 Ill.App.3d 379, 24 Ill.Dec. 707, 712, 385 N.E.2d 848, 853 (1979); *State v. Greer,* 609 S.W.2d 423, 433–34 (Mo.App.1980). The court of appeals also rejected *Frye* by comparing hypnosis to conventional interview techniques, 674 P.2d at 815.

**19.** Other courts agree. See *People v. Shirley,* 181 Cal.Rptr. at 249–51; 641 P.2d at 781–82; *People v. Gonzales,* 329 N.W.2d at 746; *State v. Mack,* 292 N.W.2d at 769; *Commonwealth v. Nazarovitch,* 436 A.2d at 177.

Moreover, if hypnosis was in fact comparable in its effects to other methods of refreshing a witness' memory, there would be no need to use it. See *People v. Hughes,* 466 N.Y.S.2d at 264, 453 N.E.2d at 494.

consensus on the reliability of hypnotically aided recall to determine whether it is generally accepted. *See People v. Shirley*, 181 Cal.Rptr. at 266, 641 P.2d at 797 ("[I]f a fair overview of the literature discloses that scientists significant either in number or expertise publicly oppose that use of hypnosis as unreliable, the court may safely conclude there is no such consensus at the present time.") It is the state's burden to show that consensus exists. *Id.* at 266, 641 P.2d at 797.

■ Consideration of the hypnosis literature as reviewed by the litigants and as set out by the court of appeals makes it clear that there is no consensus as to what hypnosis is or what it actually does. In its fledgling state, the "science" of hypnosis is far too underdeveloped to qualify under the *Frye* standard. Moreover, although there is insufficient empirical research to fully substantiate either side's claims about the benefits and dangers of hypnosis, it is quite clear that the previously hypnotized witness may be prey to the distortions wrought by suggestion, confabulation, and increased confidence.

The state next asserts that *Frye* is no longer viable in Alaska. The court of appeals, while it made no holding on the issue, noted that some authorities have maintained that *Frye* cannot survive the enactment of the federal rules of evidence. 674 P.2d at 814. The essence of the argument is that since the federal rules, which discuss the admissibility of scientific evi-

dence, do not mention the *Frye* test, it is no longer good law.[20]

We believe it unlikely that this silence was meant to overturn long-established rules of admissibility based on *Frye* such as the rule excluding polygraph testimony. Moreover we have held other pre-existing rules to survive adoption of the rules of evidence. *See, e.g., Greenway v. State*, 626 P.2d 1060, 1061 n. 3 (Alaska 1980).[21]

Federal and state courts with evidence rules adapted from the federal model have continued to apply *Frye*. *See generally* Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later*, 80 Colum.L.Rev. 1197, 1229 & nn. 251–52 (1980). We have not previously questioned *Frye* and we decline to do so now.

### B. *Evidence Rule 403.*

■ Even if *Frye* were not applied, hypnotically adduced testimony would have to be excluded under Evidence Rule 403 because it is more prejudicial than probative.[22] In so holding, we reject the court of appeals' analysis.

The court of appeals regarded the probative value of the hypnotically adduced testimony to be high and the risk of misidentification in *Contreras* and *Grumbles* to be "virtually non-existent" because the identifications were supported by substantial corroborative detail. 674 P.2d at 819. The court observed that S.J.'s identification of Contreras was corroborated by the testimony of E.L., who was assaulted with S.J.,

---

20. C. Wright and K. Graham, Federal Practice and Procedure: Evidence § 5168, at 91 (1978); 3 J. Weinstein Evidence ¶ 702[03], at 702–16–18 (1982). Some courts are in agreement. *See, e.g., United States v. Williams*, 583 F.2d 1194, 1197–98 (2nd Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *State v. Hall*, 297 N.W.2d 80, 84–85 (Iowa 1980), *cert. denied*, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981).

21. In *Greenway* we held that a hearsay exception recognized in a prior case, *Torres v. State*, 519 P.2d 788, 793 n. 9 (Alaska 1974), but not listed in evidence rule 803, was still valid and that "this omission, ... was more in the nature of an oversight ... and not a repudiation of

*Torres."* We referred the question to the standing committee on the evidence rules. Note, however, that Rule 803 was not in effect at the time of Greenway's trial and therefore did not govern the case. *See generally* Langum, *Uncodified Federal Evidence Rules Applicable to Civil Trials*, 19 Willamette L.Rev. 513 (1983).

22. Rule 403 states:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

and by Camfferman's testimony.[23] 674 P.2d at 818. The court also observed that Hall's identification of Grumbles was corroborated by her pre-hypnotic identification of a car in front of her house, the presence of a gun in Grumbles' apartment which was determined to have been fired in Hall's residence, the fact that a brown leather jacket seized at Grumbles' apartment was identified by Hall as having been worn by her assailant, and the fact that a glove found at Hall's residence was identified as similar to gloves known to belong to Grumbles. 674 P.2d at 818.

The court also found it "unlikely" that Officer Parmeter could have suggested the identity of the defendants to S.J. or Hall because they were not suspects when S.J. and Hall were hypnotized. 674 P.2d at 818–19. Consequently, the court concluded that the probative value of the identifications was high.

The court of appeals regarded the prejudice to the state to be great if the identifications were to be excluded, because jurors would wonder why S.J. and Hall could not identify their assailants. 674 P.2d at 819.

The court thus concluded after balancing the prejudice from misidentification against the probativeness of the identification that the testimony of Hall and S.J. was admissible. 674 P.2d at 819.

There are two reasons to reject this "balancing" of equities analysis. One, reliance on "corroborative" testimony results in bootstrapping admissibility solely because both sets of evidence seem to point toward the same person's guilt.[24] In the case where corroborative evidence exists, the need for the hypnotically refreshed testimony is lessened since the corroborating evidence could often be used in its place. Two, the police are not prevented from using hypnosis as an investigative tool if they wish. Indeed, a clear *per se* exclusionary rule provides the police with the incentive to preserve pre-hypnosis testimony appropriately and use hypnosis only when conventional investigation has failed.

We recognize that some courts have adopted a case-by-case approach using the Rule 403 standard.[25] We believe however that the case-by-case approach is time consuming, creates a risk of non-uniform re-

**23.** Camfferman was Contreras' girlfriend. She testified before the grand jury that the night of the incident Contreras came home and told her that he had just robbed a couple. Camfferman, after identifying the victims from their stolen driver's licenses, called S.J. to apologize for Contreras' actions. 674 P.2d at 818.

**24.** As one court stated:

Reliability of hypnotically generated testimony, not its plausibility, should determine whether it is accepted. Polygraph evidence, voice stress test results, and pathometer exam readings are disallowed because the procedures used have not been generally accepted in the scientific community as producing reliable results; such evidence does not become admissible because other evidence corroborates it. For the court to admit what seems to be true and exclude what does not subverts the traditional role of jurors as the exclusive judges of the facts. With corroboration "the linchpin of admissibility", false hypnotically produced testimony based on "pseudo memory" which happens to coincide with other evidence could come in. Crucial reliable but uncorroborated testimony would be barred. Consequences of such a rule are readily imagined. (citations omitted)

*People v. Hughes*, 88 A.D.2d 17, 452 N.Y.S.2d at 932. A further problem with the reliance on corroboration is that the more suggestive the hypnotic interview, the more "corroborative" detail there is likely to be.

**25.** *House v. State*, 445 So.2d 815 (Miss.1984); *Brown v. State*, 426 So.2d 76 (Fla.App.1983).

In *House*, the court held that in every criminal case where a previously hypnotized witness wishes to testify, the trial judge must conduct a hearing to determine whether eight minimum procedural safeguards have been met. Both compliance with the safeguards *and* advance determination of compliance outside of the jury's presence are mandatory. Even if full compliance exists, the trial judge still has the discretion to weigh the probativeness versus prejudice of the evidence. 445 So.2d at 826–27.

In *Brown* the court held that the trier of fact must determine in each case whether the probative value of hypnotically adduced testimony is outweighed by its prejudicial effects. The party seeking to offer the evidence must demonstrate by clear and convincing evidence that its use will not cause undue prejudice or mislead the jury. The court suggested nine procedural safeguards and held that parties advocating admission "should attempt to satisfy" these criteria. 426 So.2d at 90–91.

**138**

sults and requires judges to become hypnosis experts in order to make intelligent determinations about the efficacy of particular procedural safeguards and about whether there is in fact substantial compliance with those safeguards.

We conclude that the prejudice/probity balance weighs per se in favor of exclusion.[26] We are not convinced that corroboration is a panacea, even if strict procedural safeguards are observed concerning the hypnotic session. We are sufficiently persuaded of the potential dangers of suggestability, confabulation and enhanced certainty on the part of previously hypnotized witnesses to view the degree of prejudice to the defendant as extremely high and we are not convinced that expert testimony can sufficiently overcome the likelihood that a jury may be misled by such testimony.[27]

### C. *The Right to Confrontation.*

The right of the accused to confront the witnesses against him is guaranteed under the Alaska Constitution, Art. I, §§ 7, 11. Defendant's constitutional right to confrontation protects two interests:

First, it guarantees him the opportunity to cross-examine the witnesses against him so as to test their sincerity, memory, ability to perceive and relate, and the factual basis of their statements. Second, it enables the defendant to demonstrate to the jury the witness' demeanor when confronted by the defendant so that the inherent veracity of the witness is displayed in the crucible of the courtroom.

*Lemon v. State,* 514 P.2d 1151, 1153 (Alaska 1973) (footnotes omitted).

Contreras and Grumbles argue that it is impossible to effectively cross-examine a previously hypnotized witness because of the effects of suggestion, confabulation and enhanced certainty. A witness's natural sincerity may be irreparably altered by hypnosis. Moreover, hypnosis can also affect the witness' normal demeanor in a manner favoring the prosecution.[28]

The court of appeals analyzed the confrontation issue by analogizing hypnotically adduced testimony to hearsay. 674 P.2d at 819. For hearsay to be admissible without violating a defendant's right to confrontation, the declarant must be unavailable and the hearsay statements must bear "adequate indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–2539, 65 L.Ed.2d 597, 607–08 (1980). The court of appeals reasoned that if S.J. and Hall are considered to be "unavailable" because their demeanor was altered by hypnosis, their hypnotically adduced testimony bears adequate indicia of

**26.** At least one court using the prejudicial versus probative standard in lieu of *Frye* has excluded hypnotically adduced testimony *per se,* albeit in particular circumstances. In *United States v. Valdez,* 722 F.2d 1196, 1200–03 (5th Cir.1984), while the court acknowledged that hypnotically adduced testimony is not without probative value, it doubted that any number of procedural safeguards could remove all unreliability from the testimony. Therefore, it fashioned a *per se* rule, limited to the nature of the case before it: "[W]hen ... a hypnotized subject identifies for the first time a person he has reason to know is already under suspicion, the post-hypnotic testimony is inadmissible whatever procedural safeguards were used to attempt to sanitize the hypnotic session." *Id.* at 1203.

**27.** The greatest danger of scientific evidence is its potential to mislead the jury. Giannelli, *Novel Scientific Evidence,* 80 Colum.L.Rev at 1237. A case-by-case Rule 403 approach requires the judge to determine the extent to which a jury will be misled, which in turn requires the judge to have some understanding of the novel technique. A judge without knowledge is prey to overstatements and unqualified assertions by expert witnesses.

Giannelli concludes that a case-by-case approach may not adequately protect against the admission of unreliable evidence. Therefore he argues it is preferable to proceed under *Frye.* The assumption that the adversary process will somehow expose any shakiness in the evidence is a contention that Giannelli finds to be unsupported. *Id.* at 1239–45.

**28.** *State v. Mena,* 624 P.2d at 1280; *Peterson v. State,* 448 N.E.2d at 678; *People v. Gonzales,* 329 N.W.2d at 748; *State v. Mack,* 292 N.W.2d at 768–69. *See also Commonwealth v. Kater,* 447 N.E.2d at 1197; *People v. Hughes,* 466 N.Y.S.2d at 264, 453 N.E.2d at 494.

reliability given the various pieces of corroborative evidence existing in both cases.[29]

If the analogy between hearsay and hypnotically adduced testimony is appropriate, then in our view the same rules concerning unavailability should apply. Under *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543, 65 L.Ed.2d at 613, a witness is unavailable only if a "good-faith effort" has been made to obtain the witness' presence at trial. *See generally Stores v. State*, 625 P.2d 820, 825–27 (Alaska 1980); *Green v. State*, 579 P.2d 14, 17–18 (Alaska 1978). The police in Contreras' and Grumbles' cases arguably failed to make duly diligent, good faith efforts to exhaust other investigative leads before resorting to hypnosis. Neither Hall nor S.J. were shown photo line-ups prior to hypnosis.[30] The police did not thoroughly interview S.J. or E.L. so they could be questioned about their attacker's appearance.

■ In addition, we think it a mistake to confuse the issue of the testimony's reliability with corroboration of the substantive aspects of the hypnotically adduced statements. Federal and Alaska case law has set forth a number of factors indicative of reliability which are applicable in the confrontation context. *Dutton v. Evans*, 400 U.S. 74, 88–89, 91 S.Ct. 210, 219–220, 27 L.Ed.2d 213, 227 (1970) (plurality opinion), *cited in Hawley v. State*, 614 P.2d 1349, 1358–59 (Alaska 1980). These factors focus on inherent aspects of the statement and the circumstances under which it was made.[31] Focusing on corroboration leads to bootstrapping unreliable testimony. The notion that witnesses can be made "unavailable" through hypnosis and then have their statements made reliable through corroboration is troublesome. Given the potential danger that a witness' demeanor can be altered by hypnosis, we conclude that defendants are deprived of their constitutional right of confrontation under the Alaska Constitution when hypnotically adduced evidence is introduced.

## III. ADMISSIBILITY OF TESTIMONY REGARDING FACTS RELATED PRIOR TO HYPNOSIS.

■ The fact that hypnotically adduced testimony is excluded does not mean, however, that the previously hypnotized witness is entirely barred from giving testimony. We adopt the approach of *State v. Peoples*, 319 S.E.2d at 188. There the court set out the following rule:

A person who has been hypnotized may testify as to facts which he related before the hypnotic session. The hypnotized witness may not testify to any fact not related by the witness before the hypnotic session. Investigators, attorneys, and other parties who might have occasion to induce potential witnesses to be hypnotized are cautioned to make every effort to preserve, in writing or otherwise, this pre-hypnotic information. When a party attempts to offer testimony by a person who has been hypnotized, that party will bear the burden of proving that the proffered testimony was related prior to hypnosis. A party proffering the testimony of a previously hypnotized subject is under a duty to disclose the fact of this hypnosis to the court and counsel, outside the presence of the jury and before the testimony of the witness.

We wish to make clear that this rule does not affect the use of hypnosis in criminal investigations. We caution, however, those who use hypnosis; it is a procedure to be executed with care. We

---

**29.** To wit: "Contreras' admissions to his girl-friend, Grumbles' inculpatory statements, and the fact that both Contreras and Grumbles were found in possession of their victims' property." 674 P.2d at 819.

**30.** Even if there were no suspects, showing Hall and S.J. photo line-ups might have established their base "error rate" or propensity to identify people they had not seen before.

**31.** The factors are: (1) The declaration contained no assertion of a past fact; (2) the declarant had personal knowledge of the identity and role of participants in the crime; (3) the possibility that the declarant was relying on faulty memory was remote; (4) the circumstances under which the statements were made did not provide reason to believe that the declarant had misrepresented the defendant's involvement in the crime.

suggest that the procedural safeguards formulated by Dr. Orne [32] ... be followed in the use of hypnosis for criminal investigative purposes. *See Valdez*, 722 F.2d at 1204; *Collins*, 132 Ariz. at 187, 644 P.2d at 1273.[33]

REVERSED.

MATTHEWS, J., concurs.

BURKE, J., dissents.

MATTHEWS, Justice, concurring in the result.

No one doubts that hypnosis can be extremely valuable. Hypnosis can "play a crucial role" in reviving the memory of trial witnesses. Henderson, *Admissibility of Hypnotically Enhanced Testimony: Have the Courts Been Mesmerized?*, 6 J. Legal Med. 293, 298 (1985). Beginning in the 1970's, medical, psychiatric, psychological, and dental associations officially endorsed hypnosis as a therapeutic technique. *Id.* at 296. Hypnosis is used widely in such areas as anesthesia, psychosomatic medicine, psychotherapy, enhancement of recall, and augmenting performance. *Id.*

The trouble for courts is that hypnotized subjects are susceptible to suggestion, may tend to confabulate details they don't really remember, and may be unable to distinguish what they really remember from what they merely think they remember. *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112, 1119–20 (8th Cir.1985). The question is whether these drawbacks are so serious that the benefits of hypnosis must be lost.

Some jurisdictions hold that hypnotically aided testimony is admissible. *Id.* at 1120 & n. 9. They rely on the traditional tools of our adversary system—cross-examination, expert testimony, and cautionary jury instructions—to separate accurate from inaccurate testimony. Ruffra, *Hypnotically Induced Testimony: Should It Be Admitted?* 19 Crim.L.Bull. 293, 299 (1983). Other jurisdictions exclude such evidence as inadmissible *per se. Sprynczynatyk*, 771 F.2d at 1120 & n. 10. They do so because of a belief that the risk of the witness giving, and the jury accepting, untruthful testimony is unacceptably high. *Id.* at 1121. Today, Alaska adopts this approach.

Total admissibility and total inadmissibility, however, are not the only alternatives. A number of jurisdictions have adopted an approach between these two extremes which guards against the risks created by hypnotically aided testimony while preserving its benefits. The Supreme Court of New Jersey first espoused this position in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (N.J.1981).[1] The court held that "hypnoti-

---

**32.** These safeguards include:

(1) The hypnotic session should be conducted by a person specially trained in the use of hypnosis, who is aware of the dangers of hypnosis,

(2) The person conducting the hypnotic session should be independent from and not responsible to the prosecution or defense, and unrelated to the victim or any witness,

(3) The entire hypnotic session should be electronically recorded, preferably on videotape,

(4) A record of the information given to the hypnotist concerning the case in advance of the hypnotic session should be preserved,

(5) Before hypnosis, the hypnotist should obtain a detailed description from the subject of the facts relevant to the subject matter under investigation. His inquiry, however, should avoid adding new facts to those described by the subject,

(6) Other persons should not attend the hypnotic session, unless their presence is essential

to the conduct of a proper session. In no event, should such persons participate in the session, and care should be taken to see that they do not influence the result.
*See, Orne, The Use and Misuse of Hypnosis, supra*, note 11 at 335–36.

**33.** *See also People v. Shirley*, 181 Cal.Rptr. at 273, 641 P.2d at 805; *State v. Mack*, 292 N.W.2d at 771; *Collins v. Superior Court*, 644 P.2d at 1295.

The California Supreme Court has exempted the criminal defendant's own hypnotically adduced testimony from its rule of inadmissibility "to avoid impairing the fundamental right of the accused to testify in his own behalf." *People v. Shirley*, 181 Cal.Rptr. at 273, 641 P.2d at 805. This issue is not before us and we need not decide it here.

**1.** Other courts have also adopted a "middle of the road" approach. *See, e.g., Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112 (8th Cir.

cally-induced testimony may be admissible if the proponent of the testimony can demonstrate that the use of hypnosis in the particular case was a reasonably reliable means of restoring memory comparable to normal recall in its accuracy." *Id.* at 92. In my opinion, Alaska should take the middle ground.

The court in *Hurd* outlined a multi-part approach for determining whether the hypnosis in a particular trial was a reliable procedure. First, the trial judge should consider the appropriateness of hypnosis for the kind of memory loss at issue. *Id.* at 95. For example, hypnosis is reasonably reliable in reviving normal recall where the person's inability to remember results from a pathological reason such as a trauma, but not where the witness has no recollection at all, has a motive for not remembering, or where hypnosis is used as a tool for verifying conflicting accounts. Hence, the judge should admit the evidence in the former circumstances, but not in the latter. This preliminary inquiry would minimize the risk of inaccurate testimony by restricting the use of hypnosis to the cases where it will do the most good.

Second, proponents of hypnotically aided evidence should observe strict procedural safeguards. They should:

(1) demonstrate that a licensed professional psychiatrist or psychologist conducted the hypnosis;

(2) demonstrate that the psychiatrist or psychologist was independent from the prosecution and the defense;

(3) record the information given to the hypnotist prior to the hypnotic session;

(4) obtain a recorded, detailed description of the facts as the subject remembers them before the hypnosis;

(5) record all contacts between the hypnotist and the subject; and

(6) exclude all persons except the hypnotist and the subject during all phases of the hypnotic session.

*Id.* at 96–97. These safeguards would eliminate the possibility of leading witnesses by suggestion to tell the story that the police or prosecution would like them to tell. They do not eliminate the possibility of unintentional confabulation, but they minimize this danger by requiring a record of the pre-hypnosis testimony.

Third, the proponent of the evidence must establish admissibility by "clear and convincing evidence." *Id.* at 97. This standard places a heavy burden on those who wish to rely on hypnosis. By doing so it guards against unreliable evidence.

The *Hurd* tests and standards need not be exclusive. For example, I would add the requirements that the trial judge give (1) the opponent of the evidence wide latitude in cross-examining the witness, and (2) the jury a cautionary instruction which warns of the potential dangers of hypnosis. *See Brown v. State,* 426 So.2d 76, 93 (Fla. Dist.Ct.App.1983). Probing cross-examination will help the opponent of the hypnosis evidence to overcome its dangers while a cautionary instruction will alert the jury to the existence of those dangers.

1985); *United States v. Charles,* 561 F.Supp. 694 (S.D.Texas 1983); *Brown v. State,* 426 So.2d 76 (Fla.Dist.Ct.App.1983); *State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571 (1984); *People v. Smrekar,* 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979); *Pearson v. State,* 441 N.E.2d 468 (Ind. 1982); *House v. State,* 445 So.2d 815 (Miss. 1984); *State v. Brown,* 337 N.W.2d 138 (N.D. 1983); *State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (1981), *cert. quashed by* 98 N.M. 51, 644 P.2d 1040 (1982); *State v. Long,* 32 Wash.App. 732, 649 P.2d 845 (1982); *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386 (Wis.), *cert. denied,* 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983); *see also Clay v. Vose,* 771 F.2d 1 (1st Cir.1985) (hypnotically induced testimony is admissible in case where witness gave pre-

hypnotic identification before a carefully instructed jury which heard expert testimony on the validity of hypnosis); *United States v. Valdez,* 722 F.2d 1196 (5th Cir.1984) (post-hypnotic testimony may be admissible in some cases where procedural safeguards are followed, but not where hypnotized subject identifies a person for the first time whom he has reason to know is a suspect); *United States v. Keplinger,* 776 F.2d 678 (7th Cir.1985) (court declines to adopt a *per se* rule prohibiting post-hypnotic testimony); *United States v. Narcisco,* 446 F.Supp. 252 (E.D.Mich.1977) (identification of suspect after hypnosis should not be excluded because it did not create a substantial likelihood of misidentification).

The approach of the majority suffers from the disadvantage of excluding hypnotically aided evidence in *every case,* no matter how great the probable reliability of the evidence. The majority opinion brushes aside the middle approach with the contention that it is time consuming, requires judges to become hypnosis experts, and creates a risk of non-uniform results.

None of these arguments withstands scrutiny. First, it is difficult to understand how the *Hurd* approach requires any more time or expertise than other complex medical or scientific questions before the court. As science moves forward the courts cannot stand still merely because the issues are more complex and time intensive. Second, the problem with the majority opinion is precisely that it mandates a uniform approach—inadmissibility—without regard to the circumstances of each case. In some cases, hypnotically induced testimony will be extremely probative and in others it will not. The flaw in the majority opinion is that it fails to offer an approach which can discriminate between the two situations.

A *per se* rule of inadmissibility creates a double standard. Proneness to suggestion and confabulation are natural traits encountered in *unhypnotized* witnesses. Any witness may testify incorrectly with a good deal of confidence—from the inveterate liar to the witness who is "convinced" of his or her accuracy. Distortion also occurs during the questioning of a witness because (1) the witness feels pressure to answer in spite of gaps in his or her memory, and (2) the examiner unwittingly signals the "correct" answers. *Hurd,* 432 A.2d at 94–95. Furthermore, research shows that witnesses become more confident in their testimony as time progresses "in spite of the natural tendency of memory to decay." *Id.* at 95.

It is unrealistic to insist that hypnotically aided testimony be free from these faults. All that can be expected is that hypnotically aided testimony will be comparable in reliability to ordinary testimony. Alaska can achieve this goal without totally barring hypnotically induced testimony from the trial process.[2]

Because the hypnotic procedures in the present cases were not conducted by a licensed, independent practitioner, I agree that the evidence in question should not be admitted. I thus concur in the result, but not in the reasoning of today's majority opinion.

BURKE, Justice, dissenting.

In my judgment, these cases were decided correctly by the court of appeals. *State v. Contreras,* 674 P.2d 792 (Alaska App. 1983). Therefore, I dissent.[1]

---

2. A *per se* rule of inadmissibility is also inconsistent with the Alaska approach to witness competency. The *per se* rule amounts to a judgment that all witnesses who have had their memory refreshed through hypnosis are incompetent to testify. Yet, the rule in Alaska is that: "The question of competency of a particular witness to testify is ... left in the sound discre-

tion of the trial judge." *McMaster v. State,* 512 P.2d 879, 881 (Alaska 1973).

1. Despite my dissent, I agree that a general rule is needed, and believe that we should use our rule making authority to develop one. Generally, I would favor a "middle of the road" approach, similar to the one advocated by Justice Matthews.